# ARNETT, DIRECTOR, OFFICE OF ECONOMIC OPPORTUNITY, ET AL. v. KENNEDY ET AL.

No. 72–1118.  Argued November 7, 1973—Decided April 16, 1974

REHNQUIST, J., announced the Court's judgment and delivered an opinion, in which BURGER, C. J., and STEWART, J., joined. POWELL, J., filed an opinion concurring in part and concurring in the result in part, in which BLACKMUN, J., joined, *post*, p. 164. WHITE, J., filed an opinion concurring in part and dissenting in part, *post*, p. 171. DOUGLAS, J., filed a dissenting opinion, *post*, p. 203. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post*, p. 206.

*Daniel M. Friedman* argued the cause for appellants. On the brief were *Solicitor General Bork, Assistant Attorney General Wood; Keith A. Jones, Walter H. Fleischer,* and *William Kanter.*

*Charles Barnhill, Jr.,* argued the cause for appellees. With him on the brief were *Judson H. Miner* and *Leo Pellerzi.**

MR. JUSTICE REHNQUIST announced the judgment of the Court in an opinion in which THE CHIEF JUSTICE and MR. JUSTICE STEWART join.

Prior to the events leading to his discharge, appellee Wayne Kennedy [1] was a nonprobationary federal em-

---

*Mozart G. Ratner* and *Jerry D. Anker* filed a brief for the National Association of Letter Carriers, AFL–CIO, et al. as *amici curiae* urging affirmance.

[1] "Appellee" refers to appellee Wayne Kennedy, the named plaintiff in the original complaint. The participation of the 18 other named plaintiffs, who were added in the amended complaint, see n. 3, *infra*, appears to have been little more than nominal. The amended complaint alleged that the added named plaintiffs' exercise of their rights of free speech were chilled because they feared that any off-duty public comments made by them would constitute grounds for discharge or punishment under the Lloyd-La Follette Act. Two conclusory affidavits supporting that bare allegation (one signed by one of the added named plaintiffs, the other by the

ployee in the competitive Civil Service. He was a field representative in the Chicago Regional Office of the Office of Economic Opportunity (OEO). In March 1972, he was removed from the federal service pursuant to the provisions of the Lloyd-La Follette Act, 5 U. S. C. § 7501, after Wendell Verduin, the Regional Director of the OEO, upheld written administrative charges made in the form of a "Notification of Proposed Adverse Action" against appellee. The charges listed five events occurring in November and December 1971; the most serious of the charges was that appellee "without any proof whatsoever and in reckless disregard of the actual facts" known to him or reasonably discoverable by him had publicly stated that Verduin and his administrative assistant had attempted to bribe a representative of a community action organization with which the OEO had dealings. The alleged bribe consisted of an offer of a $100,000 grant of OEO funds if the representative would sign a statement against appellee and another OEO employee.

Appellee was advised of his right under regulations promulgated by the Civil Service Commission and the OEO to reply to the charges orally and in writing, and to submit affidavits to Verduin. He was also advised that the material on which the notice was based was available for his inspection in the Regional Office, and that a copy of the material was attached to the notice of proposed adverse action.

Appellee did not respond to the substance of the charges against him, but instead asserted that the charges were unlawful because he had a right to a trial-type hearing before an impartial hearing officer before he could be removed from his employment, and because state-

remaining 17) were filed in connection with plaintiffs' motion for summary judgment or temporary injunctive relief.

ments made by him were protected by the First Amendment to the United States Constitution.[2] On March 20, 1972, Verduin notified appellee in writing that he would be removed from his position at the close of business on March 27, 1972. Appellee was also notified of his right to appeal Verduin's decision either to the OEO or to the Civil Service Commission.

Appellee then instituted this suit in the United States District Court for the Northern District of Illinois on behalf of himself and others similarly situated, seeking both injunctive and declaratory relief. In his amended complaint,[3] appellee contended that the standards and procedures established by and under the Lloyd-La Follette Act for the removal of nonprobationary em-

[2] Appellee's response to the "Notification of Proposed Adverse Action," made through counsel, set forth briefly his position that the charges against him were unlawful under the Fifth and First Amendments. One of the three sentences devoted to his First Amendment claim noted parenthetically that the "conversations . . . with union members and the public" for which he was being punished were "inaccurately set forth in the adverse action." Appellee's response did not explain in what respects the charges against him were inaccurate, nor did it offer any alternative version of the events described in the charges.

[3] Appellee's original complaint, filed March 27, 1972, contained two counts. In the first count appellee sought, on behalf of himself and others similarly situated, to enjoin his removal pending a full, trial-type hearing before an impartial hearing officer. In the second count appellee sought to enjoin his removal for the exercise of his rights of free speech. The single-judge court referred the constitutional question presented in the first count to a three-judge court, and dismissed the second count pending appellee's exhaustion of available administrative remedies before the Civil Service Commission. Appellee then amended the second count of his complaint to allege, on behalf of himself, 18 added named plaintiffs, see n. 1, supra, and others similarly situated, that the Lloyd-La Follette Act's removal standard was unconstitutionally vague and overbroad and violated the plaintiffs' First Amendment rights.

ployees from the federal service unwarrantedly interfere with those employees' freedom of expression and deny them procedural due process of law. The three-judge District Court, convened pursuant to 28 U. S. C. §§ 2282 and 2284, granted summary judgment for appellee. 349 F. Supp. 863. The court held that the discharge procedures authorized by the Act and attendant Civil Service Commission and OEO regulations denied appellee due process of law because they failed to provide for a trial-type hearing before an impartial agency official prior to removal; the court also held the Act and implementing regulations unconstitutionally vague because they failed to furnish sufficiently precise guidelines as to what kind of speech may be made the basis of a removal action. The court ordered that appellee be reinstated in his former position with backpay, and that he be accorded a hearing prior to removal in any future removal proceedings. Appellants were also enjoined from further enforcement of the Lloyd-La Follette Act, and implementing rules, as "construed to regulate the speech of competitive service employees."[4]

## I

The numerous affidavits submitted to the District Court by both parties not unexpectedly portray two widely differing versions of the facts which gave rise to this lawsuit. Since the District Court granted summary judgment to appellee, it was required to resolve all genuine disputes as to any material facts in favor of appellants, and we therefore take as true for purposes

---

[4] The court ordered appellee's reinstatement but deferred determination whether the suit was maintainable as a class action. Appellee's appeal to the Civil Service Commission was first delayed as a result of the pendency of this suit, then "terminated" because of appellee's reinstatement following the decision of the District Court.

of this opinion the material particulars of appellee's conduct which were set forth in the notification of proposed adverse action dated February 18, 1972. The District Court's holding necessarily embodies the legal conclusions that, even though all of these factual statements were true, the procedure which the Government proposed to follow in this case was constitutionally insufficient to accomplish appellee's discharge, and the standard by which his conduct was to be judged in the course of those procedures infringed his right of free speech protected by the First Amendment.

The statutory provisions which the District Court held invalid are found in 5 U. S. C. § 7501. Subsection (a) of that section provides that "[a]n individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service."

Subsection (b) establishes the administrative procedures by which an employee's rights under subsection (a) are to be determined, providing:

"(b) An individual in the competitive service whose removal or suspension without pay is sought is entitled to reasons in writing and to—

"(1) notice of the action sought and of any charges preferred against him;

"(2) a copy of the charges;

"(3) a reasonable time for filing a written answer to the charges, with affidavits; and

"(4) a written decision on the answer at the earliest practicable date.

"Examination of witnesses, trial, or hearing is not required but may be provided in the discretion of the individual directing the removal or suspension without pay. Copies of the charges, the notice of hearing, the answer, the reasons for and the order

of removal or suspension without pay, and also the reasons for reduction in grade or pay, shall be made a part of the records of the employing agency, and, on request, shall be furnished to the individual affected and to the Civil Service Commission."

This codification of the Lloyd-La Follette Act is now supplemented by the regulations of the Civil Service Commission, and, with respect to the OEO, by the regulations and instructions of that agency. Both the Commission and the OEO have by regulation given further specific content to the general removal standard in subsection (a) of the Act. The regulations of the Commission [5] and the OEO, [6] in nearly identical language, re-

---

[5] 5 CFR §§ 735.201a, 735.209. Section 735.201a provides:

"An employee shall avoid any action, whether or not specifically prohibited by this subpart, which might result in, or create the appearance of:

"(a) Using public office for private gain;

"(b) Giving preferential treatment to any person;

"(c) Impeding Government efficiency or economy;

"(d) Losing complete independence or impartiality;

"(e) Making a Government decision outside official channels; or

"(f) Affecting adversely the confidence of the public in the integrity of the Government."

Section 735.209 provides:

"An employee shall not engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government."

[6] 45 CFR §§ 1015.735–1, 1015.735–24. Section 1015.735–. provides:

"The purpose of this part is to guide OEO employees toward maintaining the high standard of integrity expected of all Government employees. It is intended to require that employees avoid any action which might result in, or create the appearance of:

"(a) Using public office for private gain;

"(b) Giving preferential treatment to any organization or person;

"(c) Impeding Government efficiency or economy;

"(d) Making a Government decision outside official channels;

"(e) Losing complete independence or impartiality of action; or

quire that employees "avoid any action .... which might result in, or create the appearance of . . . [a]ffecting adversely the confidence of the public in the integrity of [OEO and] the Government," and that employees not "engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful or other conduct prejudicial to the Government." The OEO further provides by regulation that its Office of General Counsel is available to supply counseling on the interpretation of the laws and regulations relevant to the conduct of OEO employees.[7]

Both the Commission and the OEO also follow regulations enlarging the procedural protections accorded by the Act itself.[8] The Commission's regulations provide,

"(f) Affecting adversely the confidence of the public in the integrity of OEO and the Government."

Section 1015.735-24 provides:

"No employee shall engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct or other conduct prejudicial to the Government."

[7] 45 CFR § 1015.735-4. Section 1015.735-4 provides:

"The Office of General Counsel of OEO is available to advise on the interpretation of the provisions of this part and the other laws and regulations relevant to the conduct of OEO employees. The General Counsel is designated as OEO counselor for this purpose."

[8] The Civil Service Commission regulations governing procedures for adverse actions implement, in addition to the Lloyd-La Follette Act, the Veterans' Preference Act of 1944 and Executive Order No. 11491. The Veterans' Preference Act, Act of June 27, 1944, c. 287, 58 Stat. 387, imposed procedural requirements for processing adverse actions in addition to those imposed by the Lloyd-La Follette Act. Those additional requirements include an opportunity for the employee to respond orally or in writing to the charges on which his dismissal is based; the Veterans' Preference Act also authorizes Civil Service Commission appeals from adverse agency decisions. See 5 U. S. C. § 7701. The Act itself applies only to veterans of military service, 5 U. S. C. §§ 2108, 7511, but Executive Order No. 11491, printed in note following 5 U. S. C. § 7301, extends the Act's protections to all nonpreference eligible employees in the classified service.

*inter alia,* that the employing agency must give 30 days' advance written notice to the employee prior to removal, and make available to him the material on which the notice is based.[9] They also provide that the employee shall have an opportunity to appear before the official vested with authority to make the removal decision in order to answer the charges against him,[10]

[9] 5 CFR § 752.202 (a). Section 752.202 (a) provides:

"(a) *Notice of proposed adverse action.* (1) Except as provided in paragraph (c) of this section, an employee against whom adverse action is sought is entitled to at least 30 full days' advance written notice stating any and all reasons, specifically and in detail, for the proposed action.

"(2) Subject to the provisions of subparagraph (3) of this paragraph, the material on which the notice is based and which is relied on to support the reasons in that notice, including statements of witnesses, documents, and investigative reports or extracts therefrom, shall be assembled and made available to the employee for his review. The notice shall inform the employee where he may review that material.

"(3) Material which cannot be disclosed to the employee, or to his designated physician under § 294.401 of this chapter, may not be used by an agency to support the reasons in the notice."

[10] 5 CFR § 752.202 (b). Section 752.202 (b) provides:

"(b) *Employee's answer.* Except as provided in paragraph (c) of this section, an employee is entitled to a reasonable time for answering a notice of proposed adverse action and for furnishing affidavits in support of his answer. The time to be allowed depends on the facts and circumstances of the case, and shall be sufficient to afford the employee ample opportunity to review the material relied on by the agency to support the reasons in the notice and to prepare an answer and secure affidavits. The agency shall provide the employee a reasonable amount of official time for these purposes if he is otherwise in an active duty status. If the employee answers, the agency shall consider his answer in reaching its decision. The employee is entitled to answer personally, or in writing, or both personally and in writing. The right to answer personally includes the right to answer orally in person by being given a reasonable opportunity to make any representations which the employee believes might sway the final decision on his case, but does

that the employee must receive notice of an adverse decision on or before its effective date, and that the employee may appeal from an adverse decision.[11] This appeal may be either to a reviewing authority within the employing agency,[12] or directly to the Commis-

not include the right to a trial or formal hearing with examination of witnesses. When the employee requests an opportunity to answer personally, the agency shall make a representative or representatives available to hear his answer. The representative or representatives designated to hear the answer shall be persons who have authority either to make a final decision on the proposed adverse action or to recommend what final decision should be made."

[11] 5 CFR § 752.202 (f). Section 752.202 (f) provides:

"(f) *Notice of adverse decision.* The employee is entitled to notice of the agency's decision at the earliest practicable date. The agency shall deliver the notice of decision to the employee at or before the time the action will be made effective. The notice shall be in writing, be dated, and inform the employee:

"(1) Which of the reasons in the notice of proposed adverse action have been found sustained and which have been found not sustained;

"(2) Of his right of appeal to the appropriate office of the Commission;

"(3) Of any right of appeal to the agency under Subpart B of Part 771 of this chapter, including the person with whom, or the office with which, such an appeal shall be filed;

"(4) Of the time limit for appealing as provided in § 752.204;

"(5) Of the restrictions on the use of appeal rights as provided in § 752.205; and

"(6) Where he may obtain information on how to pursue an appeal."

[12] 5 CFR §§ 771.205, 771.208. Section 771.205 provides:

"An employee is entitled to appeal under the agency appeals system from the original decision. The agency shall accept and process a properly filed appeal in accordance with its appeals system."

Section 771.208 provides:

"(a) *Entitlement.* Except as provided in paragraph (b) of this section, an employee is entitled to a hearing on his appeal before an examiner. The employee is entitled to appear at the hearing personally or through or accompanied by his representative. The

sion,[13] and the employee is entitled to an evidentiary trial-type hearing at the appeal stage of the proceeding.[14] The only trial-type hearing available within the OEO is, by

hearing may precede either the original decision or the appellate decision, at the agency's option. Only one hearing shall be held unless the agency determines that unusual circumstances require a second hearing.

"(b) *Denial of hearing.* The agency may deny an employee a hearing on his appeal only (1) when a hearing is impracticable by reason of unusual location or other extraordinary circumstance, or (2) when the employee failed to request a hearing offered before the original decision.

"(c) *Notice.* The agency shall notify an employee in writing before the original decision or before the appellate decision of (1) his right to a hearing, or (2) the reasons for the denial of a hearing."

[13] 5 CFR § 752.203. Section 752.203 provides:

"An employee is entitled to appeal to the Commission from an adverse action covered by this subpart. The appeal shall be in writing and shall set forth the employee's reasons for contesting the adverse action, with such offer of proof and pertinent documents as he is able to submit."

Appeals to both the discharging agency and the Commission from an original adverse action will not be processed concurrently, 5 CFR § 752.205 (a), and a direct appeal to the Commission from an initial removal decision constitutes a waiver of appeal rights within the employing agency. 5 CFR § 752.205 (b). However, if the employee first appeals within the employing agency, he is entitled, if necessary, to an appeal to the Commission. 5 CFR § 752.205 (c).

[14] 5 CFR §§ 771.208, 771.210–771.212, 772.305 (c). Sections 771.210–771.212 govern the conduct of hearings by the discharging agency. Those sections provide:

"§ 771.210 Conduct of hearing.

"(a) The hearing is not open to the public or the press. Except as provided in paragraph (h) of this section, attendance at a hearing is limited to persons determined by the examiner to have a direct connection with the appeal.

"(b) The hearing is conducted so as to bring out pertinent facts, including the production of pertinent records.

virtue of its regulations and practice, typically held after actual removal; [15] but if the employee is reinstated on appeal, he receives full backpay, less any amounts earned by him through other employment during that period.[16]

"(c) Rules of evidence are not applied strictly, but the examiner shall exclude irrelevant or unduly repetitious testimony.

"(d) Decisions on the admissibility of evidence or testimony are made by the examiner.

"(e) Testimony is under oath or affirmation.

"(f) The examiner shall give the parties opportunity to cross-examine witnesses who appear and testify.

"(g) The examiner may exclude any person from the hearing for contumacious conduct or misbehavior that obstructs the hearing.

"(h) An agency may provide through a negotiated agreement with a labor organization holding exclusive recognition for the attendance at hearings under this subpart of an observer from that organization. When attendance is provided for, the agreement shall further provide that when the employee who requested the hearing objects to the attendance of an observer on grounds of privacy, the examiner shall determine the validity of the objection and make the decision on the question of attendance.

"§ 771.211 Witnesses.

"(a) Both parties are entitled to produce witnesses.

"(b) The agency shall make its employees available as witnesses before an examiner when requested by the examiner after consideration of a request by the employee or the agency.

"(c) If the agency determines that it is not administratively practicable to comply with the request of the examiner, it shall notify him in writing of the reasons for that determination. If, in the examiner's judgment, compliance with his request is essential to a full and fair hearing, he may postpone the hearing until such time as the agency complies with his request.

"(d) Employees of the agency are in a duty status during the time they are made available as witnesses.

"(e) The agency shall assure witnesses freedom from restraint, interference, coercion, discrimination, or reprisal in presenting their testimony.

"§ 771.212 Record of hearing.

"(a) The hearing shall be recorded and transcribed verbatim. All

We must first decide whether these procedures established for the purpose of determining whether there is "cause" under the Lloyd-La Follette Act for the dismissal

documents submitted to and accepted by the examiner at the hearing shall be made a part of the record of the hearing. If the agency submits a document that is accepted, it shall furnish a copy of the document to the employee. If the employee submits a document that is accepted, he shall make the document available to the agency representative for reproduction.

"(b) The employee is entitled to be furnished a copy of the hearing record at or before the time he is furnished a copy of the report of the examiner."

Section 772.305 (c) governs the conduct of hearings before the Civil Service Commission. It provides:

"(c) *Hearing procedures.* (1) An appellant is entitled to appear at the hearing on his appeal personally or through or accompanied by his representative. The agency is also entitled to participate in the hearing. Both parties are entitled to produce witnesses. The Commission is not authorized to subpoena witnesses.

"(2) An agency shall make its employees available as witnesses at the hearing. when (i) requested by the Commission after consideration of a request by the appellant or the agency and (ii) it is administratively practicable to comply with the request of the Commission. If the agency determines that it is not administratively practicable to comply with the request of the Commission, it shall submit to the Commission its written reasons for the declination. Employees of the agency shall be in a duty status during the time they are made available as witnesses. Employees of the agency shall be free from restraint, interference, coercion, discrimination, or reprisal in presenting their testimony.

"(3) Hearings are not open to the public or the press. Attendance at hearings is limited to persons determined by the Commission to have a direct connection with the appeal.

"(4) A representative of the Commission shall conduct the hearing and shall afford the parties opportunity to introduce evidence (including testimony and statements by the appellant, his representative, representatives of the agency, and witnesses), and to cross-examine witnesses. Testimony is under oath or affirmation. Rules of evidence are not applied strictly, but the representative

148

of a federal employee comport with procedural due process, and then decide whether that standard of "cause" for federal employee dismissals was within the constitutional power of Congress to adopt.

## II

For almost the first century of our national existence, federal employment was regarded as an item of patronage, which could be granted, withheld, or withdrawn for whatever reasons might appeal to the responsible executive hiring officer. Following the Civil War, grass-roots sentiment for "Civil Service reform" began to grow, and it was apparently brought to a head by the assassination of President James A. Garfield on July 2, 1881. Garfield, having then held office only four months, was accosted in Washington's Union Station and shot by a dissatisfied office seeker who believed that the President had been instrumental in refusing his request for appointment as United States Consul in Paris. During the

of the Commission shall exclude irrelevant or unduly repetitious testimony.

"(5) The office of the Commission having initial jurisdiction of the appeal shall determine how the hearing will be reported. When the hearing is reported verbatim, that office shall make the transcript a part of the record of the proceedings and shall furnish a copy of the transcript to each party. When the hearing is not reported verbatim, the representative of the Commission who conducts the hearing shall make a suitable summary of the pertinent portions of the testimony. When agreed to in writing by the parties, the summary constitutes the report of the hearing and is made a part of the record of the proceedings. Each party is entitled to be furnished a copy of the report of the hearing. If the representative of the Commission and the parties fail to agree on the summary, the parties are entitled to submit written exceptions to any parts of the summary which are made a part of the record of the proceedings for consideration in deciding the appeal."

[15] OEO Staff Instruction No. 771-2 (1971).

[16] 5 U. S. C. § 5596.

summer, while President Garfield lingered prior to his death in September, delegates from 13 Civil Service reform associations met and formed the National Civil Service Reform League. Responding to public demand for reform led by this organization, Congress in January 1883 enacted the Pendleton Act.[17]

While the Pendleton Act is regarded as the keystone in the present arch of Civil Service legislation, by present-day standards it was quite limited in its application. It dealt almost exclusively with entry into the federal service, and hardly at all with tenure, promotion, removal, veterans' preference, pensions, and other subjects addressed by subsequent Civil Service legislation. The Pendleton Act provided for the creation of a classified Civil Service, and required competitive examination for entry into that service. Its only provision with respect to separation was to prohibit removal for the failure of an employee in the classified service to contribute to a political fund or to render any political service.[18]

For 16 years following the effective date of the Pendleton Act, this last-mentioned provision of that Act appears to have been the only statutory or regulatory limitation on the right of the Government to discharge classified employees. In 1897, President William McKinley promulgated Civil Service Rule II,[19] which provided that removal from the competitive classified service should not be made except for just cause and for

---

[17] Act of Jan. 16, 1883, c. 27, 22 Stat. 403.

[18] *Id.*, § 2.

[19] Fifteenth Report of the Civil Service Commission 70 (1897–1898). Rule II, § 8, provided: "No removal shall be made from any position subject to competitive examination except for just cause and upon written charges filed with the head of the Department or other appointing officer, and of which the accused shall have full notice and an opportunity to make defense."

reasons given in writing. While job tenure was thereby accorded protection, there were no administrative appeal rights for action taken in violation of this rule, and the courts declined to judicially enforce it. Thus matters stood with respect to governmental authority to remove federal employees until the enactment of the Lloyd-La Follette Act.

The Lloyd-La Follette Act was enacted as one section of the Post Office Department appropriation bill for the fiscal year 1913. That Act guaranteed the right of federal employees to communicate with members of Congress, and to join employee organizations. It also substantially enacted and enlarged upon Civil Service Rule II in the following language:

"[N]o person in the classified civil service of the United States shall be removed therefrom except for such cause as will promote the efficiency of said service and for reasons given in writing, and the person whose removal is sought shall have notice of the same and of any charges preferred against him, and be furnished with a copy thereof, and also be allowed a reasonable time for personally answering the same in writing; and affidavits in support thereof; but no examination of witnesses nor any trial or hearing shall be required except in the discretion of the officer making the removal; and copies of charges, notice of hearing, answer, reasons for removal, and of the order of removal shall be made a part of the records of the proper department or office, as shall also the reasons for reduction in rank or compensation; and copies of the same shall be furnished to the person affected upon request, and the Civil Service Commission also shall, upon request, be furnished copies of the same. . . ."[20]

---

[20] Act of Aug. 24, 1912, c. 389, § 6, 37 Stat. 555.

That Act, as now codified, 5 U. S. C. § 7501, together with the administrative regulations issued by the Civil Service Commission and the OEO, provided the statutory and administrative framework which the Government contends controlled the proceedings against appellee. The District Court, in its ruling on appellee's procedural contentions, in effect held that the Fifth Amendment to the United States Constitution prohibited Congress, in the Lloyd-La Follette Act, from granting protection against removal without cause and at the same time—indeed, in the same sentence—specifying that the determination of cause should be without the full panoply of rights which attend a trial-type adversary hearing. We do not believe that the Constitution so limits Congress in the manner in which benefits may be extended to federal employees.

Appellee recognizes that our recent decisions in *Board of Regents* v. *Roth,* 408 U. S. 564 (1972), and *Perry* v. *Sindermann,* 408 U. S. 593 (1972), are those most closely in point with respect to the procedural rights constitutionally guaranteed public employees in connection with their dismissal from employment. Appellee contends that he had a property interest or an expectancy of employment which could not be divested without first affording him a full adversary hearing.

In *Board of Regents* v. *Roth,* we said:

> "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U. S., at 577.

Here appellee did have a statutory expectancy that he not be removed other than for "such cause as will pro-

mote the efficiency of [the] service." But the very section of the statute which granted him that right, a right which had previously existed only by virtue of administrative regulation, expressly provided also for the procedure by which "cause" was to be determined, and expressly omitted the procedural guarantees which appellee insists are mandated by the Constitution. Only by bifurcating the very sentence of the Act of Congress which conferred upon appellee the right not to be removed save for cause could it be said that he had an expectancy of that substantive right without the procedural limitations which Congress attached to it. In the area of federal regulation of government employees, where in the absence of statutory limitation the governmental employer has had virtually uncontrolled latitude in decisions as to hiring and firing, *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 896–897 (1961), we do not believe that a statutory enactment such as the Lloyd-La Follette Act may be parsed as discretely as appellee urges. Congress was obviously intent on according a measure of statutory job security to governmental employees which they had not previously enjoyed, but was likewise intent on excluding more elaborate procedural requirements which it felt would make the operation of the new scheme unnecessarily burdensome in practice. Where the focus of legislation was thus strongly on the procedural mechanism for enforcing the substantive right which was simultaneously conferred, we decline to conclude that the substantive right may be viewed wholly apart from the procedure provided for its enforcement. The employee's statutorily defined right is not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which Congress has designated for the determination of cause.

The Court has previously viewed skeptically the action of a litigant in challenging the constitutionality of por-

tions of a statute under which it has simultaneously claimed benefits. In *Fahey* v. *Mallonee,* 332 U. S. 245 (1947), it was observed:

"In the name and right of the Association it is now being asked that the Act under which it has its existence be struck down in important particulars, hardly severable from those provisions which grant its right to exist. . . . It would be intolerable that the Congress should endow an association with the right to conduct a public banking business on certain limitations and that the Court at the behest of those who took advantage from the privilege should remove the limitations intended for public protection. It would be difficult to imagine a more appropriate situation in which to apply the doctrine that one who utilizes an Act to gain advantages of corporate existence is estopped from questioning the validity of its vital conditions." *Id.,* at 255–256.

"It is an elementary rule of constitutional law that one may not 'retain the benefits of an Act while attacking the constitutionality of one of its important conditions.' *United States* v. *San Francisco,* 310 U. S. 16, 29. As formulated by Mr. Justice Brandeis, concurring in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 348, 'The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits.' " *Id.,* at 255.

This doctrine has unquestionably been applied unevenly in the past, and observed as often as not in the breach. We believe that at the very least it gives added weight to our conclusion that where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in

determining that right, a litigant in the position of appellee must take the bitter with the sweet.

To conclude otherwise would require us to hold that although Congress chose to enact what was essentially a legislative compromise, and with unmistakable clarity granted governmental employees security against being dismissed without "cause," but refused to accord them a full adversary hearing for the determination of "cause," it was constitutionally disabled from making such a choice. We would be holding that federal employees had been granted, as a result of the enactment of the Lloyd-La Follette Act, not merely that which Congress had given them in the first part of a sentence, but that which Congress had expressly withheld from them in the latter part of the same sentence. Neither the language of the Due Process Clause of the Fifth Amendment nor our cases construing it require any such hobbling restrictions on legislative authority in this area.

Appellees urge that the judgment of the District Court must be sustained on the authority of cases such as *Goldberg* v. *Kelly*, 397 U. S. 254 (1970), *Fuentes* v. *Shevin*, 407 U. S. 67 (1972), *Bell* v. *Burson*, 402 U. S. 535 (1971), and *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969). *Goldberg* held that welfare recipients are entitled under the Due Process Clause of the Fifth and Fourteenth Amendments to an adversary hearing before their benefits are terminated. *Fuentes* v. *Shevin* held that a hearing was generally required before one could have his property seized under a writ of replevin. In *Bell* v. *Burson* the Court held that due process required a procedure for determining whether there was a reasonable possibility of a judgment against a driver as a result of an accident before his license and vehicle registration could be suspended for failure to post security under Georgia's uninsured motorist statute. And in *Sniadach*

v. *Family Finance Corp.* a Wisconsin statute providing for prejudgment garnishment without notice to the debtor or prior hearing was struck down as violative of the principles of due process. These cases deal with areas of the law dissimilar to one another and dissimilar to the area of governmental employer-employee relationships with which we deal here. The types of "liberty" and "property" protected by the Due Process Clause vary widely, and what may be required under that Clause in dealing with one set of interests which it protects may not be required in dealing with another set of interests.

> "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers* v. *McElroy,* 367 U. S., at 895.

Here the property interest which appellee had in his employment was itself conditioned by the procedural limitations which had accompanied the grant of that interest. The Government might, then, under our holdings dealing with Government employees in *Roth, supra,* and *Sindermann, supra,* constitutionally deal with appellee's claims as it proposed to do here.[21]

---

[21] Our Brother WHITE would hold that Verduin himself might not make the initial decision as to removal on behalf of the agency, because he was the victim of the alleged slander which was one of the bases for appellee's removal. Because of our holding with respect to appellee's property-type expectations under *Roth* and *Sindermann,* we do not reach this question in its constitutional dimension. But since our Brother WHITE suggests that he reaches that conclusion as a matter of statutory construction, albeit because of constitutional emanations, we state our reasons for disagreeing with his conclusion. We, of course, find no constitutional overtones lurking in the statutory issue, because of our holding as to the nature of appellee's property interest in his employment. The reference in the Lloyd-La Follette Act itself to the discretion "of the officer making the removal" suggests rather strongly that he is likewise the

Appellee also contends in this Court that because of the nature of the charges on which his dismissal was based, he was in effect accused of dishonesty, and that therefore a hearing was required before he could be deprived of this element of his "liberty" protected by the Fifth Amendment against deprivation without due process. In *Board of Regents* v. *Roth,* 408 U. S., at 573, we said:

> "The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of

officer who will have brought the charges, and there is no indication that during the 60 years' practice under the Act it has ever been administratively construed to require the initial hearing on the discharge to be before any official other than the one making the charges. And while our Brother WHITE's statement of his conclusion suggests that it may be limited to facts similar to those presented here, *post,* at 199, we doubt that in practice it could be so confined. The decision of an employee's supervisor to dismiss an employee "for such cause as will promote the efficiency of the service" will all but invariably involve a somewhat subjective judgment on the part of the supervisor that the employee's performance is not "up to snuff." Employer-employee disputes of this sort can scarcely avoid involving clashes of personalities, and while a charge that an employee has defamed a supervisor may generate a maximum of personal involvement on the part of the latter, a statement of more typical charges will necessarily engender some degree of personal involvement on the part of the supervisor.

Additional difficulties in applying our Brother WHITE's standard would surely be found if the official bringing the charges were himself the head of a department or an agency, for in that event none of his subordinates could be assumed to have a reasonable degree of detached neutrality, and the initial hearing would presumably have to be conducted by someone wholly outside of the department or agency. We do not believe that Congress, clearly indicating as it did in the Lloyd-LaFollette Act its preference for relatively simple procedures, contemplated or required the complexities which would be injected into the Act by our Brother WHITE.

his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. . ... In such a case, due process would accord an opportunity to refute the charge before university officials." [22]

The liberty here implicated by appellants' action is not the elemental freedom from external restraint such as was involved in *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), but is instead a subspecies of the right of the individual "to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923). But that liberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee. Since the purpose of the hearing in such a case is to provide the person "an opportunity to clear his name," a hearing afforded by administrative appeal procedures after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause. Here appellee chose not to rely on his administrative appeal, which, if his factual contentions are correct, might well have vindicated his reputation and removed any wrongful stigma from his reputation.

Appellee urges that the delays in processing agency and Civil Service Commission appeals, amounting to more than three months in over 50% of agency appeals,[23] mean that the available administrative appeals do not

[22] The Court's footnote there stated:

"The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons." 408 U. S., at 573 n. 12.

[23] See Merrill, Procedures for Adverse Actions Against Federal Employees, 59 Va. L. Rev. 196, 206 (1973).

suffice to protect his liberty interest recognized in *Roth.*
During the pendency of his administrative appeals,
appellee asserts, a discharged employee suffers from both
the stigma and the consequent disadvantage in obtaining
a comparable job that result from dismissal for cause
from Government employment. We assume that some
delay attends vindication of an employee's reputation
throughout the hearing procedures provided on appeal,
and conclude that at least the delays cited here do not
entail any separate deprivation of a liberty interest
recognized in *Roth.*

## III

Appellee also contends that the provisions of 5 U. S. C.
§ 7501 (a), authorizing removal or suspension without
pay "for such cause as will promote the efficiency of the
service," are vague and overbroad. The District Court
accepted this contention:

> "Because employees faced with the standard of 'such
> cause as will promote the efficiency of the service'
> can only guess as to what utterances may cost them
> their jobs, there can be little question that they will
> be deterred from exercising their First Amendment
> rights to the fullest extent." 349 F. Supp., at 866.

A certain anomaly attends appellee's substantive con-
stitutional attack on the Lloyd-La Follette Act just as it
does his attack on its procedural provisions. Prior to
the enactment of this language in 1912, there was no
such statutory inhibition on the authority of the Govern-
ment to discharge a federal employee, and an employee
could be discharged with or without cause for con-
duct which was not protected under the First Amend-
ment. Yet under the District Court's holding, a federal
employee after the enactment of the Lloyd-La Follette
Act may not even be discharged for conduct which con-
stitutes "cause" for discharge and which is not protected

by the First Amendment, because the guarantee of job security which Congress chose to accord employees is "vague" and "overbroad."

We hold the standard of "cause" set forth in the Lloyd-La Follette Act as a limitation on the Government's authority to discharge federal employees is constitutionally sufficient against the charges both of overbreadth and of vagueness. In *CSC* v. *Letter Carriers*, 413 U. S. 548, 578–579 (1973), we said:

> "[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. '[T]he general class of offense to which . . . [the provisions are] directed is plainly within [their] terms . . . , [and they] will not be struck down as vague, even though marginal cases could be put where doubts might arise.' *United States* v. *Harriss*, 347 U. S. 612, 618 (1954)."

Congress sought to lay down an admittedly general standard, not for the purpose of defining criminal conduct, but in order to give myriad different federal employees performing widely disparate tasks a common standard of job protection. We do not believe that Congress was confined to the choice of enacting a detailed code of employee conduct, or else granting no job protection at all. As we said in *Colten* v. *Kentucky*, 407 U. S. 104 (1972):

> "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficul-

ties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Id.,* at 110.

Here the language "such cause as will promote the efficiency of the service" was not written upon a clean slate in 1912, and it does not appear on a clean slate now. The Civil Service Commission has indicated that what might be said to be longstanding principles of employer-employee relationships, like those developed in the private sector, should be followed in interpreting the language used by Congress.[24] Moreover, the OEO has provided by regulation that its Office of General Counsel is available to counsel employees who seek advice on the interpretation of the Act and its regulations.[25] We found the similar procedure offered by the Civil Service Commission important in rejecting the respondents' vagueness contentions in *CSC* v. *Letter Carriers,* 413 U. S., at 580.

The phrase "such cause as will promote the efficiency of the service" as a standard of employee job protection is without doubt intended to authorize dismissal for speech as well as other conduct. *Pickering* v. *Board of Education,* 391 U. S. 563, 568 (1968), makes it clear that in certain situations the discharge of a Government employee may be based on his speech without offending guarantees of the First Amendment:

"At the same time it cannot be gainsaid that the State has interests as an employer in regulating the

---

[24] The Federal Personnel Manual, Subchapter S3–1. a., states: "Basically a 'cause' for disciplinary adverse action is a recognizable offense against the employer-employee relationship. Causes for adverse action run the entire gamut of offenses against the employer-employee relationship, including inadequate performance of duties and improper conduct on or off the job. . . ." Supp. 752–1, Adverse Action by Agencies, Feb. 1972.

[25] See n. 7, *supra.*

speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

Because of the infinite variety of factual situations in which public statements by Government employees might reasonably justify dismissal for "cause," we conclude that the Act describes, as explicitly as is required, the employee conduct which is ground for removal. The essential fairness of this broad and general removal standard, and the impracticability of greater specificity, were recognized by Judge Leventhal, writing for a panel of the United States Court of Appeals for the District of Columbia Circuit in *Meehan* v. *Macy*, 129 U. S. App. D. C. 217, 230, 392 F. 2d 822, 835 (1968), modified, 138 U. S. App. D. C. 38, 425 F. 2d 469, aff'd en banc, 138 U. S. App. D. C. 41, 425 F. 2d 472 (1969):

"[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees include 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.' We think it is inherent in the employment relationship as a matter of common sense if not [of] common law that [a Government] employee . . . cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory [cartoons]. . . . [Dismissal in such circumstances

neither] comes as an unfair surprise [nor] is so unexpected as to chill . . . freedom to engage in appropriate speech."

Since Congress when it enacted the Lloyd-La Follette Act did so with the intention of conferring job protection-rights on federal employees which they had not previously had, it obviously did not intend to authorize discharge under the Act's removal standard for speech which is constitutionally protected. The Act proscribes only that public speech which improperly damages and impairs the reputation and efficiency of the employing agency, and it thus imposes no greater controls on the behavior of federal employees than are necessary for the protection of the Government as an employer. Indeed the Act is not directed at speech as such, but at employee behavior, including speech, which is detrimental to the efficiency of the employing agency. We hold that the language "such cause as will promote the efficiency of the service" in the Act excludes constitutionally protected speech, and that the statute is therefore not overbroad. *Colten* v. *Kentucky*, 407 U. S., at 111. We have observed previously that the Court has a duty to construe a federal statute to avoid constitutional questions where such a construction is reasonably possible. *United States* v. *12 200-ft. Reels of Film*, 413 U. S. 123, 130 n. 7 (1973); *United States* v. *Thirty-seven Photographs*, 402 U. S. 363, 368–369 (1971).

We have no hesitation, as did the District Court, in saying that on the facts alleged in the administrative charges against appellee, the appropriate tribunal would infringe no constitutional right of appellee in concluding that there was "cause" for his discharge. *Pickering* v. *Board of Education*, 391 U. S., at 569. Nor have we any doubt that satisfactory proof of these allegations could constitute "such cause as will promote the effi-

ciency of the service" within the terms of 5 U. S. C. § 7501 (a). Appellee's contention then boils down to the assertion that although no constitutionally protected conduct of his own was the basis for his discharge on the Government's version of the facts, the statutory language in question must be declared inoperative, and a set of more particularized regulations substituted for it, because the generality of its language might result in marginal situations in which other persons seeking to engage in constitutionally protected conduct would be deterred from doing so. But we have held that Congress in establishing a standard of "cause" for discharge did not intend to include within that term any constitutionally protected conduct. We think that our statement in *Colten* v. *Kentucky,* is a complete answer to appellee's contention:

> "As we understand this case, appellant's own conduct was not immune under the First Amendment and neither is his conviction vulnerable on the ground that the statute threatens constitutionally protected conduct of others." 407 U. S., at 111.

In sum, we hold that the Lloyd-La Follette Act, in at once conferring upon nonprobationary federal employees the right not to be discharged except for "cause" and prescribing the procedural means by which that right was to be protected, did not create an expectancy of job retention in those employees requiring procedural protection under the Due Process Clause beyond that afforded here by the statute and related agency regulations. We also conclude that the post-termination hearing procedures provided by the Civil Service Commission and the OEO adequately protect those federal employees' liberty interest, recognized in *Roth, supra,* in not being wrongfully stigmatized by untrue and unsupported administrative charges. Finally, we hold that

the standard of employment protection imposed by Congress in the Lloyd-La Follette Act, is not impermissibly vague or overbroad in its regulation of the speech of federal employees and therefore unconstitutional on its face. Accordingly, we reverse the decision of the District Court on both grounds on which it granted summary judgment and remand for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE POWELL, with whom MR. JUSTICE BLACK-MUN joins, concurring in part and concurring in the result in part.

For the reasons stated by MR. JUSTICE REHNQUIST, I agree that the provisions of 5 U. S. C. § 7501 (a) are neither unconstitutionally vague nor overbroad. I also agree that appellee's discharge did not contravene the Fifth Amendment guarantee of procedural due process. Because I reach that conclusion on the basis of different reasoning, I state my views separately.

I

The applicability of the constitutional guarantee of procedural due process depends in the first instance on the presence of a legitimate "property" or "liberty" interest within the meaning of the Fifth or Fourteenth Amendment. Governmental deprivation of such an interest must be accompanied by minimum procedural safeguards, including some form of notice and a hearing.[1]

---

[1] As the Court stated in *Boddie* v. *Connecticut,* 401 U. S. 371, 378 (1971), "The formality and procedural requisites for [a due process] hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." In this case, we are concerned with an administrative hearing in the context of appellee's discharge from public employment.

The Court's decisions in *Board of Regents* v. *Roth,* 408
U. S. 564 (1972), and *Perry* v. *Sindermann,* 408 U. S. 593
(1972), provide the proper framework for analysis of
whether appellee's employment constituted a "property"
interest under the Fifth Amendment.   In *Roth,* the Court
stated:

> "To have a property interest in a benefit, a person
> clearly must have more than an abstract need or
> desire for it.   He must have more than a unilateral
> expectation of it.   He must, instead, have a legiti-
> mate claim of entitlement to it.   It is a purpose
> of the ancient institution of property to protect those
> claims upon which people rely in their daily lives,
> reliance that must not be arbitrarily undermined.
> It is a purpose of the constitutional right to a
> hearing to provide an opportunity for a person to
> vindicate those claims.
>
> "Property interests, of course, are not created by
> the Constitution.   Rather, they are created and their
> dimensions are defined by existing rules or under-
> standings that stem from an independent source such
> as state law—rules or understandings that secure
> certain benefits and that support claims of entitle-
> ment to those benefits."   408 U. S., at 577.

The Court recognized that the "wooden distinction"
between "rights" and "privileges" was not determinative
of the applicability of procedural due process and that
a property interest may be created by statute as well as
by contract.   *Id.,* at 571.   In particular, the Court stated
that a person may have a protected property interest
in public employment if contractual or statutory pro-
visions guarantee continued employment absent "suffi-
cient cause" for discharge.   *Id.,* at 576–578.

In *Sindermann,* the Court again emphasized that a
person may have a protected property interest in con-

tinued public employment. There, a state college teacher alleged that the college had established a *de facto* system of tenure and that he had obtained tenure under that system. The Court stated that proof of these allegations would establish the teacher's legitimate claim of entitlement to continued employment absent "sufficient cause" for discharge. In these circumstances, the teacher would have a property interest safeguarded by due process, and deprivation of that interest would have to be accompanied by some form of notice and a hearing.

Application of these precedents to the instant case makes plain that appellee is entitled to invoke the constitutional guarantee of procedural due process. Appellee was a nonprobationary federal employee, and as such he could be discharged only for "cause." 5 U. S. C. § 7501 (a). The federal statute guaranteeing appellee continued employment absent "cause" for discharge conferred on him a legitimate claim of entitlement which constituted a "property" interest under the Fifth Amendment. Thus termination of his employment requires notice and a hearing.

The plurality opinion evidently reasons that the nature of appellee's interest in continued federal employment is necessarily defined and limited by the statutory procedures for discharge and that the constitutional guarantee of procedural due process accords to appellee no procedural protections against arbitrary or erroneous discharge other than those expressly provided in the statute. The plurality would thus conclude that the statute governing federal employment determines not only the nature of appellee's property interest, but also the extent of the procedural protections to which he may lay claim. It seems to me that this approach is incompatible with the principles laid down in *Roth* and *Sindermann*. Indeed, it would lead directly to the conclusion that whatever the nature

of an individual's statutorily created property interest, deprivation of that interest could be accomplished without notice or a hearing at any time. This view misconceives the origin of the right to procedural due process. That right is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in federal employment,[2] it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. As our cases have consistently recognized, the adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms. *Goldberg* v. *Kelly,* 397 U. S. 254 (1970);[3] *Bell* v. *Burson,* 402 U. S. 535 (1971); *Board of Regents* v. *Roth, supra; Perry* v. *Sindermann, supra.*

## II

Having determined that the constitutional guarantee of procedural due process applies to appellee's discharge from public employment, the question arises whether an evidentiary hearing, including the right to present favorable witnesses and to confront and examine adverse witnesses, must be accorded *before* removal. The resolution of this issue depends on a balancing process in which the Government's interest in expeditious removal

---

[2] No property interest would be conferred, for example, where the applicable statutory or contractual terms, either expressly or by implication, did not provide for continued employment absent "cause." See *Board of Regents* v. *Roth,* 408 U. S. 564, 578 (1972).

[3] In *Goldberg,* for example, the statutes and regulations defined both eligibility for welfare benefits and the procedures for termination of those benefits. The Court held that such benefits constituted a statutory entitlement for persons qualified to receive them and that the constitutional guarantee of procedural due process applied to termination of benefits. 397 U. S., at 261–263.

of an unsatisfactory employee is weighed against the interest of the affected employee in continued public employment. *Goldberg* v. *Kelly, supra,* at 263–266. As the Court stated in *Cafeteria & Restaurant Workers* v. *McElroy,* 367 U. S. 886, 895 (1961), "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."

In the present case, the Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline. Such factors are essential if the Government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency. Moreover, a requirement of a prior evidentiary hearing would impose additional administrative costs, create delay, and deter warranted discharges. Thus, the Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial.[4]

---

[4] My Brother MARSHALL rejects the Government's interest in efficiency as insignificant, citing *Goldberg* v. *Kelly,* 397 U. S. 254, 266 (1970), and *Fuentes* v. *Shevin,* 407 U. S. 67, 90–91, n. 22 (1972). He also notes that nine federal agencies presently accord prior evidentiary hearings. *Post,* at 223, 224.

Neither *Goldberg* nor *Fuentes* involved the Government's substantial interest in maintaining the efficiency and discipline of its

Appellee's countervailing interest is the continuation of his public employment pending an evidentiary hearing. Since appellee would be reinstated and awarded backpay if he prevails on the merits of his claim, appellee's actual injury would consist of a temporary interruption of his income during the interim. To be sure, even a temporary interruption of income could constitute a serious loss in many instances. But the possible deprivation is considerably less severe than that involved in *Goldberg*, for example, where termination of welfare benefits to the recipient would have occurred in the face of "brutal need." 397 U. S., at 261. Indeed, as the Court stated in that case, "the crucial factor in this context—*a factor not present in the case of . . . the discharged government employee . . .*—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of *the very means by which to live while he waits.*" *Id.*, at 264 (emphasis added). By contrast, a public employee may well have independent resources to overcome any temporary hardship, and he may be able to secure a job in the private sector. Alternatively, he will be eligible for welfare benefits.

own employees. Moreover, the fact that some federal agencies may have decided to hold prior evidentiary hearings cannot mean that such a procedure is constitutionally mandated. The Federal Government's general practice to the contrary argues that efficiency is in fact thought to be adversely affected by prior evidentiary hearings.

Nor do I agree with my Brother White's argument that suspension with pay would obviate any problem posed by prolonged retention of a disruptive or unsatisfactory employee. Aside from the additional financial burden which would be imposed on the Government, this procedure would undoubtedly inhibit warranted discharges and weaken significantly the deterrent effect of immediate removal. In addition, it would create a strong incentive for the suspended employee to attempt to delay final resolution of the issues surrounding his discharge.

Appellee also argues that the absence of a prior evidentiary hearing increases the possibility of wrongful removal and that delay in conducting a post-termination evidentiary hearing further aggravates his loss. The present statute and regulations, however, already respond to these concerns. The affected employee is provided with 30 days' advance written notice of the reasons for his proposed discharge, and the materials on which the notice is based. He is accorded the right to respond to the charges both orally and in writing, including the submission of affidavits. Upon request, he is entitled to an opportunity to appear personally before the official having the authority to make or recommend the final decision. Although an evidentiary hearing is not held, the employee may make any representations he believes relevant to his case. After removal, the employee receives a full evidentiary hearing, and is awarded backpay if reinstated. See 5 CFR §§ 771.208 and 772.305; 5 U. S. C. § 5596. These procedures minimize the risk of error in the initial removal decision and provide for compensation for the affected employee should that decision eventually prove wrongful.[5]

---

[5] My Brother WHITE argues that affirmance is required because the supervisory official who would have conducted the preremoval hearing was the "object of slander that was the basis for the employee's proposed discharge." Post, at ·199. He would conclude that this violated the statutory requirement of an "impartial decisionmaker." I find no such requirement anywhere in the statute or the regulations. Nor do I believe that due process so mandates at the preremoval stage. In my view, the relevant fact is that an impartial decisionmaker is provided at the post-removal hearing where the employee's claims are finally resolved.

There are also significant practical considerations that argue against such a requirement. In most cases, the employee's supervisor is the official best informed about the "cause" for termination. If disqualification is required on the ground that the responsible supervisor could not be wholly impartial, the removal procedure

On balance, I would conclude that a prior evidentiary hearing is not required and that the present statute and regulations comport with due process by providing a reasonable accommodation of the competing interests.[6]

MR. JUSTICE WHITE, concurring in part and dissenting in part.

The Lloyd-La Follette Act, 5 U. S. C. § 7501 (a), provides that "[a]n individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service."[1] The

---

would become increasingly complex. In effect, a "mini-trial" would be necessary to educate the impartial decisionmaker as to the basis for termination.

[6] Appellee also argues that the failure to provide a prior evidentiary hearing deprived him of his "liberty" interest in violation of the Fifth Amendment. For the reasons stated above, I find that the present statute comports with due process even with respect to appellee's liberty interest.

[1] The full text of the Act's pertinent provisions provides:

"(a) An individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service.

"(b) An individual in the competitive service whose removal or suspension without pay is sought is entitled to reasons in writing and to—

"(1) notice of the action sought and of any charges preferred against him;

"(2) a copy of the charges;

"(3) a reasonable time for filing a written answer to the charges, with affidavits; and

"(4) a written decision on the answer at the earliest practicable date.

"Examination of witnesses, trial, or hearing is not required but may be provided in the discretion of the individual directing the removal or suspension without pay. Copies of the charges, the notice of hearing, the answer, the reasons for and the order of removal or suspension without pay, and also the reasons for reduction in grade or pay, shall be made a part of the records of the employing agency, and,

regulations of the Civil Service Commission and the Office of Economic Opportunity (OEO), at which appellee was employed, give content to "cause" by specifying grounds for removal which include "any action . . . which might result in . . . [a]ffecting adversely the confidence of the public in the integrity of [OEO and] the Government" and any "criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government." [2]

Aside from specifying the standards for discharges, Congress has also established the procedural framework in which the discharge determinations are to be made. The employee is to receive 30 days' advance written notice of the action sought and of any charges preferred against him, a copy of the charges, and a

---

on request, shall be furnished to the individual affected and to the Civil Service Commission.

"(c) This section applies to a preference eligible employee as defined by section 7511 of this title only if he so elects. This section does not apply to the suspension or removal of an employee under section 7532 of this title." 5 U. S. C. § 7501.

[2] The regulation of the Civil Service Commission as to "Proscribed actions," 5 CFR § 735.201a, provides:

"An employee shall avoid any action, whether or not specifically prohibited by this subpart, which might result in, or create the appearance of:

"(a) Using public office for private gain;

"(b) Giving preferential treatment to any person;

"(c) Impeding Government efficiency or economy;

"(d) Losing complete independence or impartiality;

"(e) Making a Government decision outside official channels; or

"(f) Affecting adversely the confidence of the public in the integrity of the Government."

The regulations, 5 CFR § 735.209, also provided:

"An employee shall not engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government."

reasonable time for filing a written answer to the charges. Before being terminated he may also make a personal appearance before an agency official, and implementing Civil Service Commission regulations provide that "[t]he right to answer personally includes the right to answer orally in person by being given a reasonable opportunity to make any representations which the employee believes might sway the final decision on his case, but does not include the right to a trial or a formal hearing with examination of witnesses." The regulations further provide that the "representative or representatives designated to hear the answer shall be persons who have authority either to make a final decision on the proposed adverse action or to recommend what final decision should be made." The employee is entitled to notice of the agency's decision in writing, and the notice must inform the employee "[w]hich of the reasons in the notice of proposed adverse action have been found sustained and which have been found not sustained." [3] The employee

---

[3] The Civil Service Procedural Regulations, 5 CFR § 752.202, provide in relevant part:

"(a) *Notice of proposed adverse action.* (1) Except as provided in paragraph (c) of this section, an employee against whom adverse action is sought is entitled to at least 30 full days' advance written notice stating any and all reasons, specifically and in detail, for the proposed action.

"(2) Subject to the provisions of subparagraph (3) of this paragraph, the material on which the notice is based and which is relied on to support the reasons in that notice, including statements of witnesses, documents, and investigative reports or extracts therefrom, shall be assembled and made available to the employee for his review. The notice shall inform the employee where he may review that material.

"(3) Material which cannot be disclosed to the employee, or to his designated physician under § 294.401 of this chapter, may not be used by an agency to support the reasons in the notice.

"(b) *Employee's answer.* Except as provided in paragraph (c) of this section, an employee is entitled to a reasonable time for

may appeal from an adverse decision and is entitled to an evidentiary trial-type hearing at this stage.[4] This later hearing affords the employee certain rights not available within OEO at the pretermination stage, particu- 

answering a notice of proposed adverse action and for furnishing affidavits in support of his answer. The time to be allowed depends on the facts and circumstances of the case, and shall be sufficient to afford the employee ample opportunity to review the material relied on by the agency to support the reasons in the notice and to prepare an answer and secure affidavits. The agency shall provide the employee a reasonable amount of official time for these purposes if he is otherwise in an active duty status. If the employee answers, the agency shall consider his answer in reaching its decision. The employee is entitled to answer personally, or in writing, or both personally and in writing. The right to answer personally includes the right to answer orally in person by being given a reasonable opportunity to make any representations which the employee believes might sway the final decision on his case, but does not include the right to a trial or formal hearing with examination of witnesses. When the employee requests an opportunity to answer personally, the agency shall make a representative or representatives available to hear his answer. The representative or representatives designated to hear the answer shall be persons who have authority either to make a final decision on the proposed adverse action or to recommend what final decision should be made.

"(f) *Notice of adverse decision.* The employee is entitled to notice of the agency's decision at the earliest practicable date. The agency shall deliver the notice of decision to the employee at or before the time the action will be made effective. The notice shall be in writing, be dated, and inform the employee:

"(1) Which of the reasons in the notice of proposed adverse action have been found sustained and which have been found not sustained . . . ."

[4] The Veterans' Preference Act of 1944 authorizes Civil Service Commission appeals from adverse agency decisions. See 5 U. S. C. § 7701. The Act itself applies only to veterans of military service, 5 U. S. C. §§ 2108, 7511, but Executive Order No. 11491, printed in note following 5 U. S. C. § 7301, extends the Act's protections to all nonpreference eligible employees in the classified service.

larly the taking of testimony under oath and the cross-examination of witnesses.

Appellee Kennedy was a nonprobationary federal employee in the competitive civil service and held the position of field representative in the Chicago Regional Office of OEO. As such, he was entitled to the protection of the statutes and regulations outlined above. On February 18, 1972, Kennedy received a "Notification of Proposed Adverse Action" from the Regional Director of OEO, Wendell Verduin. The notice charged, - among other things, that Kennedy had made slanderous statements about Verduin and another coworker charging them with bribing or attempting to bribe a potential OEO grantee and had thereby caused disharmony in his office by preventing its smooth functioning. Verduin then ruled on March 20, 1972, after Kennedy had filed a written answer objecting to the lack of certain procedures furnished at this pretermination hearing, but had declined to appear personally, that Kennedy be removed from his job with OEO, effective March 27, 1972.[5]

---

[5] Appellee's response stated:

"The charges and proceedings brought against Mr. Kennedy are invalid and, in fact, unlawful for the following two reasons among others:

"*First*, Mr. Kennedy is entitled to a fair and impartial hearing *prior* to any adverse action being taken against him. This means a proceeding where there is a genuinely impartial hearing officer, a proceeding where there is an opportunity to offer witnesses and confront and cross examine those furnishing evidence against him, a proceeding where he will have an opportunity to respond to all evidence offered against him, a proceeding where a written record is made of all evidence, testimony and argument, a proceeding where the decision will be based exclusively on the record, a proceeding where the decision will contain findings of fact and conclusions of law with regard to all controverted issues, together with an analysis indicating the manner in which the controversies were resolved.

"The present adverse action procedure fails in substantial ways to provide all of these rudimentary elements required for a due

Kennedy then appealed directly to the Civil Service Commission and also instituted the present action. The first count of his complaint alleged that the discharge procedure of the Lloyd-La Follette Act, and the attendant Civil Service Commission regulations, deprived him of due process by failing to provide for a full hearing prior to termination. The second count alleged that he was discharged because of certain conversations, in violation of his rights under the First Amendment. The single judge who reviewed the complaint convened a three-judge court to hear the first count, and dismissed the second, without prejudice to refiling after the Civil Service Commission ruled on his appeal. It was the court's view that it should not act until the agency had the opportunity to review the merits of appellee's First Amendment claim.

After the convening of the three-judge court, appellee amended his complaint, then limited to the due process claim, to include a challenge to the Lloyd-La Follette Act on the grounds that it was vague and overbroad and violated the First Amendment.

The three-judge District Court, convened pursuant to 28 U. S. C. §§ 2282 and 2284, granted summary judgment for appellee. 349 F. Supp. 863. It held that the discharge procedures violated due process because "[t]here was no provision . . . for the decision on removal or suspension to be made by an impartial agency

process hearing. It therefore fails to meet the requirements of due process secured by the Fifth Amendment to the Constitution of the United States and is hence, invalid, null and void.

"*Second,* the charges brought against Mr. Kennedy are facially insufficient and illegal. As the adverse action makes clear, Mr. Kennedy is being punished for his conversations (inaccurately set forth in the adverse action) with union members and the public. Since the First Amendment protects such conversations these allegations are totally without merit." App. 62.

official, or for Kennedy (by his own means) to present witnesses; or for his right to confront adverse witnesses." *Id.,* at 865. The court also held that § 7501 was unconstitutional on vagueness and overbreadth grounds. The Government was ordered to reinstate Kennedy to his former position with backpay and to conduct any future removal proceedings with a hearing consistent with its opinion. Appellants were also enjoined from further enforcement of the Lloyd-La Follette Act, and implementing regulations, as "construed to regulate the speech of competitive service employees." *Id.,* at 866.

## I

In my view, three issues must be addressed in this case. First, does the Due Process Clause require that there be a full trial-type hearing *at some time* when a Federal Government employee in the competitive service is terminated? Secondly, if such be the case, must this hearing be held *prior* to the discharge of the employee, and, if so, was the process afforded in this case adequate? Third, and as an entirely separate matter, are the Lloyd-La Follette Act and its attendant regulations void for vagueness or overbreadth? I join the Court as to the third issue.

## II

I differ basically with the plurality's view that "where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet," and that "the property interest which appellee had in his employment was itself conditioned by the procedural limitations which had accompanied the grant of that interest." *Ante,* at 153–154, 155. The rationale of this position quickly leads to the conclusion that even though

the statute requires cause for discharge, the requisites of due process could equally have been satisfied had the law dispensed with any hearing at all, whether pre-termination or post-termination.

The past cases of this Court uniformly indicate that some kind of hearing is required at some time before a person is finally deprived of his property interests.[6] The principles of due process "come to us from the law of England . . . and their requirement was there designed to secure the subject against the arbitrary action of the crown and place him under the protection of the law." *Dent* v. *West Virginia,* 129 U. S. 114, 123 (1889). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Anti-Fascist Committee* v. *Mc-Grath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring).

This basic principle has unwaveringly been applied when private property has been taken by the State. A fundamental requirement of due process is "the opportunity to be heard." *Grannis* v. *Ordean,* 234 U. S. 385, 394 (1914). "It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). Where the Court has rejected the need for a hearing prior to the initial "taking," a principal rationale has been that a hearing would be provided before the taking became final. See *North American Cold Storage Co.* v. *Chicago,* 211 U. S. 306 (1908) (seizure of food unfit for consumption); *Central Trust Co.* v. *Garvan,* 254 U. S. 554 (1921) (seizure of property under Trading with the

---

[6] My views as to the requirements of due process where property interests are at stake does not deal with the entirely separate matter and requirements of due process when a person is deprived of liberty.

Enemy Act); *Corn Exchange Bank* v. *Coler*, 280
U. S. 218 (1930) (seizure of assets of an absconding
husband); *Phillips* v. *Commissioner*, 283 U. S. 589 (1931)
(collection of a tax); *Bowles* v. *Willingham*, 321 U. S.
503 (1944) (setting of price regulations); *Fahey* v. *Mallonee*, 332 U. S. 245 (1947) (appointment of conservator
of assets of savings and loan association); *Ewing* v. *Mytinger & Casselberry*, 339 U. S. 594 (1950) (seizure of
misbranded articles in commerce). While these cases
indicate that the particular interests involved might not
have demanded a hearing immediately, they also reaffirm
the principle that property may not be taken without a
hearing at some time.

This principle has also been applied in situations where
the State has licensed certain activities. Where the
grant or denial of a license has been involved, and the
"right" to engage in business has been legitimately limited by the interest of the State in protecting its citizens
from inexpert or unfit performance, the decision of the
State to grant or deny a license has been subject to a
hearing requirement. See, *e. g., Dent* v. *West Virginia,
supra* (licensing of physicians); *Goldsmith* v. *United
States Board of Tax Appeals,* 270 U. S. 117 (1926) (licensing of accountant); *Willner* v. *Committee on Character and Fitness,* 373 U. S. 96 (1963) (admission to the
bar). The Court has put particular stress on the fact
that the absence of a hearing would allow the State to
be arbitrary in its grant or denial, and to make judgments on grounds other than the fitness of a particular
person to pursue his chosen profession. In the context
of admission to the bar, the Court has stated: "Obviously
an applicant could not be excluded merely because he
was a Republican or a Negro or a member of a particular
church. Even in applying permissible standards, officers
of a State cannot exclude an applicant when there is no

basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory." *Schware* v. *Board of Bar Examiners*, 353 U. S. 232, 239 (1957). The hearing requirement has equally been applied when the license was to be removed, *In re Ruffalo*, 390 U. S. 544 (1968), or a licensee has been subject to state regulation, *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n of Ohio*, 301 U. S. 292 (1937).

Similar principles prevail when the State affords its process and mechanism of dispute settlement, its law enforcement officers, and its courts, in aiding one person to take property from another. Where there is a "taking" before a final determination of rights, as in some cases when the State seizes property, to protect one of the parties *pendente lite*, the Court has acted on the assumption that at some time a full hearing will be available, as when there is an attachment of property preliminary to resolution of the merits of a dispute, *Ownbey* v. *Morgan*, 256 U. S. 94 (1921); *Coffin Brothers* v. *Bennett*, 277 U. S. 29 (1928); *McKay* v. *McInnes*, 279 U. S. 820 (1929). The opportunity to defend one's property before it is finally taken is so basic that it hardly bears repeating. Adequate notice of the court proceeding must be furnished, *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306 (1950), and there must be jurisdiction over the person, *Pennoyer* v. *Neff*, 95 U. S. 714 (1878).

Since there is a need for some kind of hearing before a person is finally deprived of his property, the argument in the instant case, and that adopted in the plurality opinion, is that there is something different about a final taking from an individual of property rights which have their origin in the public rather than the private sector of the economy, and, as applied here, that there is no need for any hearing at any time when the Government

discharges a person from his job, even though good cause for the discharge is required. .

In cases involving employment by the Government, the earliest cases of this Court have distinguished between two situations, where the entitlement to the job is conditioned "at the pleasure" of the employer and where the job is to be held subject to certain requirements being met by the employee, as when discharge must be for "cause." The Court has stated: "The inquiry is therefore whether there were any causes of removal prescribed by law . . . . If there were, then the rule would apply that where causes of removal are specified by constitution or statute, as also where the term of office is for a fixed period, notice and hearing are essential. If there were not, the appointing power could remove at pleasure or for such cause as it deemed sufficient." *Reagan* v. *United States,* 182 U. S. 419, 425 (1901); *Shurtleff* v. *United States,* 189 U. S. 311, 314 (1903). The Court has thus made clear that Congress may limit the total discretion of the Executive in firing an employee, by providing that terminations be for cause, and only for cause, and, if it does so, notice and a hearing are "essential."

Where Executive discretion is not limited, there is no need for a hearing. In the latter event, where the statute has provided that employment was conditioned on " 'maintain[ing] the respect due to courts of justice and judicial officers,' " *Ex parte Secombe,* 19 How. 9, 14 (1857) (attorney and counsellor of court), or was subject to no conditions at all, *Ex parte Hennen,* 13 Pet. 225 (1839) (clerk of the court), no hearing is required. See also *Crenshaw* v. *United States,* 134 U. S. 99 (1890) (Navy officer could be removed at will); *Parsons* v. *United States,* 167 U. S. 324 (1897) (district attorney could be terminated by the President at his pleasure); *Keim* v. *United States,* 177 U. S. 290 (1900) (post office

clerks removable at pleasure). To like effect is *Cafeteria Workers* v. *McElroy*, 367 U. S. 886 (1961), where the Court held that no hearing need be provided to a cook employed by a private concessionaire of the Navy before the Government revoked her security clearance. The revocation of security clearances was within the "unfettered control" of the Navy in order "to manage the internal operation of an important federal military establishment." *Id.*, at 896. The Court there assumed that "Rachel Brawner could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory . . . ." *Id.*, at 898.

Where the Congress has confined Executive discretion, notice and hearing have been required. In *Anti-Fascist Committee* v. *McGrath*, 341 U. S. 123 (1951), an organization was put on the Attorney General's list, as disloyal to the United States, without a hearing before the Attorney General. The Executive Order, as defined by implementing regulations, required the Executive to make an "appropriate determination" of disloyalty. It was apparent that members of organizations employed by the Government who belonged to an organization on the Attorney General's list would be in danger of losing their jobs. The Court held, assuming the facts as alleged by the complaints were true, that it would be arbitrary, and not consistent with an "appropriate determination," to deny a hearing on the matter to the affected organizations. As Mr. Justice Frankfurter observed in his concurring opinion, "[t]he heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Id.*, at 170.

To some extent, *McGrath,* and like cases, see *Greene* v. *McElroy,* 360 U. S. 474 (1959), depended on statutory construction—the intent of Congress to require that procedural fairness be observed in making decisions on security clearances or status, which affected employment—but it is obvious that the constitutional requirements of fairness were a guiding hand to the Court's statutory interpretation. "Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process," and it has been "the Court's concern that traditional forms of fair procedure not be restricted by implication or without the most explicit action by the Nation's lawmakers . . . ." *Id.,* at 507–508.

The concern of the Court that fundamental fairness be observed when the State deals with its employees has not been limited to action which is discriminatory and infringes on constitutionally protected rights, as in *Wieman* v. *Updegraff,* 344 U. S. 183 (1952); *Slochower* v. *Board of Education,* 350 U. S. 551 (1956); *Speiser* v. *Randall,* 357 U. S. 513 (1958); *Sherbert* v. *Verner,* 374 U. S. 398 (1963). See also *Connell* v. *Higginbotham,* 403 U. S. 207 (1971). It has been observed that "constitutional protection does extend to the public servant whose exclusion pursuant to a statute is *patently arbitrary* or discriminatory." *Wieman* v. *Updegraff, supra,* at 192; *Slochower* v. *Board of Education, supra,* at 556. (Emphasis added.) In *Slochower, supra,* New York law provided that a tenured employee taking the Fifth Amendment before a legislative committee inquiring into his official conduct could be fired. Quite apart from the Fifth Amendment "penalty" assessed by the State, the Court was concerned with the arbitrariness of drawing a conclusion, without a hearing, that any employee who

took the Fifth Amendment was guilty or unfit for employment. The Court stated:

> "This is not to say that Slochower has a constitutional right to be an associate professor of German at Brooklyn College. The State has broad powers in the selection and discharge of its employees, and it may be that proper inquiry would show Slochower's continued employment to be inconsistent with a real interest of the State. But there has been no such inquiry here." *Id.,* at 559.

The Court's decisions in *Board of Regents* v. *Roth,* 408 U. S. 564 (1972), and *Perry* v. *Sindermann,* 408 U. S. 593 (1972), reiterate the notion that the Executive Branch cannot be arbitrary in depriving a person of his job, when the Legislative Branch has provided that a person cannot be fired except for cause, and, if anything, extend the principles beyond the facts of this case.

In *Sindermann,* a teacher who had held his position for a number of years but was not tenured under contract, alleged that he had *de facto* tenure under contract law, due to "the existence of rules or understandings" with the college which employed him, *id.,* at 602. The Court held that if the professor could prove the existence of a property interest it would "obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency." *Id.,* at 603. In *Roth,* an assistant professor was hired for a fixed term of one academic year, and had no tenure. The Court held that the teacher had no property interest in the job, since the terms of employment allowed that his contract not be renewed. The critical consideration was that the terms "did not provide for contract renewal absent 'sufficient cause.'" 408 U. S., at 578. The rights to continued employment were determined by state law. The Court took great pains,

however, to point out that a tenured appointment, providing for entitlement to a job, absent cause, would be a far different case.

These cases only serve to emphasize that where there is a legitimate entitlement to a job, as when a person is given employment subject to his meeting certain specific conditions, due process requires, in order to insure against arbitrariness by the State in the administration of its law, that a person be given notice and a hearing before he is finally discharged. As the Court stated in *Dismuke* v. *United States*, 297 U. S. 167, 172 (1936):

> "If [the administrative officer] is authorized to determine questions of fact his decision must be accepted unless he exceeds his authority . . . by failing to follow a procedure which satisfies elementary standards of fairness and reasonableness essential to the due conduct of the proceeding which Congress has authorized."

To be sure, to determine the existence of the property interest, as for example, whether a teacher is tenured or not, one looks to the controlling law, in this case federal statutory law, the Lloyd-La Follette Act, which provides that a person can only be fired for cause. The fact that the origins of the property right are with the State makes no difference for the nature of the procedures required. While the State may define what is and what is not property, once having defined those rights the Constitution defines due process, and as I understand it six members of the Court are in agreement on this fundamental proposition.

I conclude, therefore, that as a matter of due process, a hearing must be held at some time before a competitive civil service employee may be finally terminated for misconduct. Here, the Constitution and the Lloyd-La Follette Act converge, because a full trial-type hearing

is provided by statute before termination from the service becomes final, by way of appeal either through OEO, the Civil Service Commission, or both.[7]

A different case might be put, of course, if the termination were for reasons of pure inefficiency, assuming such a general reason could be given, in which case it would be at least arguable that a hearing would serve no useful purpose and that judgments of this kind are best left to the discretion of administrative officials. This is not such a case, however, since Kennedy was terminated on specific charges of misconduct.

## III

The second question which must be addressed is whether a hearing of some sort must be held *before* any "taking" of the employee's property interest in his job occurs, even if a full hearing is available before that taking becomes final. I must resolve this question because in my view a full hearing must be afforded at some juncture and the claim is that it must occur prior to termination. If the right to any hearing itself is a pure matter of property definition, as the plurality opinion suggests, then that question need not be faced, for any kind of hearing, or no hearing at all, would suffice. As I have suggested, the State may not dispense with the minimum procedures defined by due process, but different considerations come into play when deciding whether a pretermination hearing is required and, if it is, what kind of hearing must be had.

---

[7] *Bailey* v. *Richardson*, 86 U. S. App. D. C. 248, 182 F. 2d 46 (1950), aff'd by an equally divided court, 341 U. S. 918 (1951), is not controlling. "The basis of this holding has been thoroughly undermined in the ensuing years" with the rejection of the "right-privilege" distinction. *Board of Regents* v. *Roth*, 408 U. S. 564, 571 n. 9 (1972).

In passing upon claims to a hearing before preliminary but nonfinal deprivations, the usual rule of this Court has been that a full hearing at some time suffices. "We have repeatedly held that no hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective." "It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination." *Ewing* v. *Mytinger & Casselberry,* 339 U. S., at 598, 599. See also *Phillips* v. *Commissioner,* 283 U. S. 589, 596–597 (1931); *Scottish Union & National Insurance Co.* v. *Bowland,* 196 U. S. 611, 631–632 (1905); *Springer* v. *United States,* 102 U. S. 586, 593–594 (1881). This has seemingly been the rule whether the State was taking property from the person, as in the above-cited cases, or whether one person was taking it from another through the process of state courts. See *Ownbey* v. *Morgan,* 256 U. S. 94 (1921); *Coffin Brothers* v. *Bennett,* 277 U. S. 29 (1928); *McKay* v. *McInnes,* 279 U. S. 820 (1929).

In recent years, however, in a limited number of cases, the Court has held that a hearing must be furnished at the first stage of taking, even where a later hearing was provided. This has been true in the revocation of a state-granted license, *Bell* v. *Burson,* 402 U. S. 535 (1971), and in suits between private parties, where summary replevin procedures, *Fuentes* v. *Shevin,* 407 U. S. 67 (1972), or garnishment procedures, *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969), were attacked, and when the State has sought to terminate welfare benefits, *Goldberg* v. *Kelly,* 397 U. S. 254 (1970).[8]

---

[8] *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971), is not properly part of this quartet of cases, since no hearing was apparently ever provided to challenge the posting of one's name as an excessive drinker.

These conflicting lines of cases demonstrate, as the Court stated in *Cafeteria & Restaurant Workers v. McElroy,* 367 U. S., at 895, that "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." See also *Hannah v. Larche,* 363 U. S. 420, 440, 442 (1960); *Goldberg v. Kelly, supra,* at 263. In assessing whether a prior hearing is required, the Court has looked to how the legitimate interests asserted by the party asserting the need for a hearing, and the party opposing it, would be furthered or hindered.

In many cases, where the claim to a pretermination hearing has been rejected, it appears that the legitimate interest of the party opposing the hearing might be defeated outright if such hearing were to be held.[9] For example, when the Government or a private party lays claim to property there is often the danger that the person in possession of the property may alienate or waste it, and the Government or private party may be without recourse. Thus, the Court has held that there is no need for a prior hearing where the Government has taken preliminary custody of alleged enemy property before actual title to the property is determined, *Central Trust Co. v. Garvan,* 254 U. S. 554 (1921); *Stoehr v. Wallace,* 255 U. S. 239 (1921), or where a private creditor has sought to attach property of a debtor. See *Ownbey v. Morgan, supra; Coffin Brothers v. Bennett, supra; McKay v. McInnes, supra.* Of course, such summary action must be authorized in such a manner as to minimize the possibilities of a mistaken deprivation, by a

---

[9] See generally Freedman, Summary Action by Administrative Agencies, 40 U. Chi. L. Rev. 1 (1972).

public official in the case of administrative action, or a judge where the processes of the court are used. *Fuentes* v. *Shevin, supra.*

The danger that the purpose of the action may be defeated, or made exceedingly difficult, by requiring a prior hearing, is illustrated by *North American Cold Storage Co.* v. *Chicago,* 211 U. S. 306 (1908), where the Court sustained the constitutionality of an Illinois statute permitting health inspectors to enter cold-storage houses and "forthwith seize, condemn and destroy" unfit food. The defendants in the action claimed that while it may be necessary to seize the food pending a hearing, surely destruction of that food could not be justified. Nonetheless, the Court observed:

> "If a hearing were to be always necessary, even under the circumstances of this case, the question at once arises as to what is to be done with the food in the meantime. Is it to remain with the cold storage company, and if so under what security that it will not be removed? To be sure that it will not be removed during the time necessary for the hearing, which might frequently be indefinitely prolonged, some guard would probably have to be placed over the subject-matter of the investigation, which would involve expense, and might not even then prove effectual." *Id.,* at 320.

Similar inabilities of the party claiming a right to a prior hearing, to make the moving party in the suit whole, have appeared where incompetence and malfeasance in the administration of a bank could precipitate a financial collapse in the community, which would go uncompensated, see *Fahey* v. *Mallonee,* 332 U. S., at 250, or where, in the absence of a jeopardy assessment by the Tax Commissioner, a taxpayer might waste or conceal his assets, see *Phillips* v. *Commissioner, supra.* In all

such cases it is also significant that the party advancing the claim to a summary procedure stands ready to make whole the party who has been deprived of his property, if the initial taking proves to be wrongful, either by the credit of the public fisc or by posting a bond.

Of course, this principle cannot be applied with success to explain the Court's decisions in cases holding that a pretermination hearing is required; it is not true that the party entitled to the hearing stands ready to compensate the adversary for what may be the wrongful possession of the property in question during the pendency of the litigation. This is vividly illustrated in *Goldberg* v. *Kelly* where the Court observed that "the benefits paid to ineligible recipients pending decision at the hearing probably cannot be recouped, since these recipients are likely to be judgment proof." 397 U. S., at 266. However, other considerations have proved decisive, such as: the risk that the initial deprivation may be wrongful; the impact on the claimant to a hearing of not having the property while he waits for a full hearing; the interest of the party opposing the prior hearing and asserting the need for immediate possession in not alerting the current possessor to the lawsuit; and the risk of leaving the property in possession of the current possessor between the time notice is supplied and the time of the preliminary hearing.

In *Goldberg* and *Sniadach,* the Court observed that there was a substantial chance that the claimant to the property, be it the State or garnishor, would lose in the ultimate resolution of the controversy. In *Goldberg,* the Court took note of the "welfare bureaucracy's difficulties in reaching correct decisions on eligibility." 397 U. S., at 264 n. 12. Since the time of the decision in *Goldberg,* at least one study has shown that decisions to terminate benefits have been reversed with a fair degree of fre-

quency.[10]  Concern was also expressed with the use of garnishment in a vast number of cases where the debt was fraudulent.  *Sniadach*, 395 U. S., at 341.  In *Fuentes*, although no such empirical evidence was available, the risk of wrongful deprivations was unnecessarily increased by allowing a clerk, rather than a judge, to pass on the creditor's claim for summary replevin.  In *Bell*, the Court held unconstitutional a state statute requiring summary suspension of a driver's license of any uninsured motorist who was unable after an accident to post security for the amount of the damages claimed against him.  The only hearing held by the State on the issue of suspension excluded *any* consideration of fault, the standard on which the validity would ultimately turn.  Without some kind of probable-cause determination of fault, it was obvious that many suspensions would prove to be unwarranted.

As for the impact on the current property possessor of not having an early pretermination hearing, the Court has held that without possession of the property a person may be unable to exist at even a minimum standard of decency.  In *Goldberg*, where the person would have lost the last source of support available, aside from charity, the Court observed that "termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits.  Since he lacks independent resources, his situation becomes immediately desperate."  397 U. S., at 264.  In fact, the magnitude of deprivation may be such as to prevent the welfare recipient from pursuing his right to a later full hearing.  *Ibid.*  In *Sniadach*, the seizure of an individual's wages could "as a practical

---

[10] See Handler, Justice for the Welfare Recipient: Fair Hearings in AFDC—The Wisconsin Experience, 43 Soc. Serv. Rev. 12, 22 (1969).

matter drive a wage-earning family to the wall." 395 U. S., at 341–342 (footnote omitted). In *Bell*, the petitioner was a clergyman whose ministry required him to travel by car to cover three rural Georgia communities, and he was "severely handicapped in the performance of his ministerial duties by a suspension of his licenses." 402 U. S., at 537. The impact of deprivation increases, of course, the longer the time period between the initial deprivation and the opportunity to have a full hearing. In *Goldberg*, the Court noted that although pertinent New York regulations provided that a "fair hearing" be held within 10 working days of the request, with decision within 12 working days thereafter, "[i]t was conceded in oral argument that these time limits are not in fact observed." 397 U. S., at 260 n. 5. In *Sniadach* and *Fuentes*, there was no indication of the speed with which a court ruling on garnishment and possession would be rendered, and of course the ultimate issues on the merits in such cases must wait for a still later determination. In *Bell*, the issue of liability might not be determined until full trial proceedings in court.

The last factor to be weighed in the balance is the danger to the party claiming possession occasioned by alerting the current possessor to the lawsuit, and then leaving the property in his hands pending the holding of the preliminary hearing. In *Goldberg* and *Sniadach*, the property right seized was a flow of income, in one case from the government, and in the other from the private employer, pending the preliminary hearing. The government ran no special risk by supplying notice in advance of the cutoff, since the government was in possession of the flow of income until it was turned over piecemeal to the welfare recipient. Further, though the government could assert in the welfare case that it would incur an uncompensated loss, that risk would only be

incurred from the time the last check is delivered until the pretermination hearing is held and the administrative agency certainly has the power to offer a speedy hearing before that time is reached. See *Goldberg* v. *Kelly, supra,* at 266. In *Sniadach,* while it was true that the inability to garnish wages could leave the creditor uncompensated, if the debtor proved judgment proof, this was a risk the creditor assumed at the outset by being unsecured. Further, notice to the debtor of the pendency of the lawsuit is not likely to increase the risk that the debtor will prove to be judgment proof, since the debtor is not likely to leave his job due to the pendency of the suit. Likewise, the risk to the creditor of the debtor's drawing on his wages between the time of notice and the availability of a court hearing on the claim in no way interferes with the creditor's claim to the future flow of earnings after the hearing has been held. The garnishor, therefore, asserts not only the right to take the debtor's wages, but to take them before the controversy has been resolved. In *Bell,* the risk to the State of supplying notice to the licensee and of leaving the person in possession of the license until the hearing, was not at issue, since the state statute provided for notice and a presuspension hearing. There were few costs attached to expanding the scope of that hearing to include a probable-cause determination of fault.

With the above principles in hand, is the tenured civil-service employee entitled to a pretermination hearing, such as that provided by the Lloyd-La Follette Act?

There would be a problem of uncompensated loss to the Government, if the employee were to draw wages without working for the period between notice of a discharge and a preliminary hearing. Yet, if the charge against the employee did not indicate that the employee should be

194

excluded from the workplace pending this hearing, some work could be exacted by the Government in exchange for its payment of salary. One must also consider another type of cost to the Government. if preseparation hearings were provided—the necessity of keeping a person on the scene who might injure the public-interest through poor service or might create an uproar at the workplace. However, suspension with pay would obviate this problem.

On the employee's side of the ledger, there is the danger of mistaken termination. Discharge decisions, made *ex parte,* may be reversed after full hearing. One study reveals that in fiscal year 1970, in agencies where full pretermination hearings were routine, employees contesting removal were successful almost 20% of the time. Merrill, Procedures for Adverse Actions Against Federal Employees, 59 Va. L. Rev. 196, 204 n. 35 (1973).

The impact on the employee of being without a job pending a full hearing is likely to be considerable because "[m]ore than 75 percent of actions contested within employing agencies require longer to decide than the 60 days prescribed by [Civil Service] Ccmmission regulations. Over 50 percent take more than three months, and five percent are in process for longer than a year." *Id.,* at 206. Of course, the discharged civil servant, deprived of his source of income, can seek employment in the private sector and so cut or minimize his losses, opportunities largely unavailable to the welfare recipient in *Goldberg* or the debtor in *Sniadach.* Nonetheless, the employee may not be able to get a satisfactory position in the private sector, particularly a tenured one, and his marketability may be under a cloud due to the circumstances of his dismissal. See *Lefkowitz* v. *Turley,* 414 U. S. 70, 83–84 (1973). Cf. *Board of Regents* v. *Roth,* 408 U. S., at 574 n. 13. It should be stressed that

if such employment is unavailable the Government may truly be pursuing a partially counter-productive policy by forcing the employee onto the welfare rolls.

Finally, by providing a pretermination hearing, the Government runs no risk through providing notice, since the employee cannot run away with his job, and can surely minimize its risk of uncompensated loss by eliminating the provision for personal appearances and setting early dates for filing written objections. Altogether different considerations as to notice might be applicable, if the employee would be likely to do damage to the Government if provided with such notice. See 5 CFR § 752.202 (c)(2) (1972), providing that an agency may dispense with the 30-day notice requirement "[w]hen there is reasonable cause to believe an employee is guilty of a crime for which a sentence of imprisonment can be imposed."

Perhaps partly on the basis of some of these constitutional considerations, Congress has provided for pretermination hearings. Certainly the debate on the Lloyd-La Follette Act indicates that constitutional considerations were present in the minds of Congressmen speaking in favor of the legislation.[11] In any event, I conclude that the statute and regulations, to the extent they require 30 days' advance notice and a right to make

---

[11] Congressman Calder stated that the Act would "give assurance and confidence to the employees that they will at least get a square deal and will not permit of supervisory or executive officers filing charges of one kind against an employee and having him removed from the service or reduced in salary on evidence submitted on matters entirely foreign to the original charges that the employee has answered in writing." 48 Cong. Rec. 4654 (1912).

Congressman Konop stated:

"Any man in public service should have a right as a citizen to know why he is discharged from public duty, and as a citizen should certainly have a chance to be heard." Id., at 5207.

a written presentation, satisfy minimum constitutional requirements.

## IV

Appellee in this case not only asserts that he is entitled to a hearing at some time before his property interest is finally terminated, and to a pretermination hearing of some kind before his wages are provisionally cut off, which are currently provided to him, but also argues that he must be furnished certain procedures at this preliminary hearing not provided by Congress: an impartial hearing examiner, an opportunity to present witnesses, and the right to engage in cross-examination. In other words, his claim is not only to a pretermination hearing, but one in which full trial-type procedures are available.

## A

The facts in this case show that the Regional Director, Verduin, who charged appellee Kennedy with making slanderous statements about him as to an alleged bribe offer, also ruled in the preliminary hearing that Kennedy should be terminated.

The "Notification of Proposed Adverse Action," signed by Verduin, charged that appellee had "made statements knowingly against officials of this agency which could harm or destroy their authority, official standing or reputation" and that appellee had engaged "in a course of conduct intended to produce public notoriety and conclusions on the part of the public, without any proof whatsover and in reckless disregard of the actual facts known to you [appellee], or reasonably discoverable by you [appellee], that officials of this agency had committed or attempted to commit acts of misfeasance, nonfeasance and malfeasance." Facts were marshaled to support the charges that appellee had spoken at a union

meeting "to the effect that [Verduin and his assistant] had attempted to bribe Mr. James White Eagle Stewart by offering him a $100,000 grant of OEO funds if he would sign a statement against you [appellee] and another employee," and that appellee had spoken of the bribe to a newspaper reporter and to a radio station.

After appellee had received this notice, he made no response to the merits of the charges, but instead wrote to Verduin requesting that he was entitled to certain procedural rights at the hearing, one of which was to have "a genuinely impartial hearing officer," thus furnishing Verduin with the opportunity to recuse himself and provide an alternative hearing examiner. This was not done.

In considering appellee's claim to have an impartial hearing examiner, we might start with a first principle: "[N]o man shall be a judge in his own cause." *Bonham's Case,* 8 Co. 114a, 118a, 77 Eng. Rep. 646, 652 (1610). Verduin's reputation was certainly at stake in the charges brought against Kennedy. Indeed, the heart of the charge was that Kennedy had spoken of Verduin in reckless disregard of the truth. That Verduin almost seemed to be stating a libel complaint against Kennedy under *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), dramatizes the personal conflict which precipitated the proposed termination.

Our decisions have stressed, in situations analogous to the one faced here, that the right to an impartial decision-maker is required by due process. The Court has held that those with a substantial pecuniary interest in legal proceedings should not adjudicate these disputes. *Tumey* v. *Ohio,* 273 U. S. 510 (1927); *Ward* v. *Village of Monroeville,* 409 U. S. 57 (1972). The Court has observed that disqualification because of interest has been extended with equal force to administrative adjudications. *Gibson* v. *Berryhill,* 411 U. S. 564, 579 (1973).

In the context of contempt before a judge, where a judge trying a defendant is the object of "efforts to denounce, insult, and slander the court," and "marked personal feelings were present on both sides," the Court has held that criminal contempt proceedings should be held before a judge other than the one reviled by the contemnor. *Mayberry v. Pennsylvania*, 400 U. S. 455, 462, 464 (1971). See *In re Oliver*, 333 U. S. 257 (1948); cf. *In re Murchison*, 349 U. S. 133 (1955).

We have also stressed the need for impartiality in administrative proceedings, stating in *Goldberg v. Kelly*, *supra*. that an "impartial decision maker is essential," 397 U. S., at 271. (Citations omitted.) To the same effect was *Morrissey v. Brewer*, 408 U. S. 471, 485–486 (1972), involving revocation of parole. In both *Goldberg* and *Morrissey*, this requirement was held to apply to pretermination hearings.[12]

It may be true that any hearing without an impartial hearing officer will reflect the bias of the adjudicator. The interest of the Government in not so providing would appear slim. Given the pretermination hearing, it would seem in the Government's interest to avoid lengthy appeals occasioned by biased initial judgments, and it would be reasonable to expect more correct decisions at the initial stage at little cost if the hearing officer is impartial.

---

[12] In *Pickering v. Board of Education*, 391 U. S. 563, 579 n. 2 (1968), where the Court set aside a discharge by a Board of Education of a teacher for writing a letter to a newspaper attacking the Board, the trier of fact, the Board, was the same body that was the object of accusations in the letter. Although the Court did not rule on the due process question, since it was first raised here, it observed that "we do not propose to blind ourselves to the obvious defects in the fact-finding process occasioned by the Board's multiple functioning *vis-à-vis* appellant," citing *Tumey v. Ohio*, 273 U. S. 510 (1927), and *In re Murchison*, 349 U. S. 133 (1955).

My view is a narrower one, however. Fairness and accuracy are not always threatened simply because the hearing examiner is the supervisor of an employee, or, as in this case, the Regional Director over many employees, including appellee. But here the hearing official was the object of slander that was the basis for the employee's proposed discharge. See *Mayberry* v. *Pennsylvania, supra.* In ruling that the employee was to be terminated, the hearing examiner's own reputation, as well as the efficiency of the service, was at stake; and although Mr. Verduin may have succeeded, in fact, in disassociating his own personal feelings from his decision as to the interests of OEO, the risk and the appearance that this was not the case were too great to tolerate. In such situations the official normally charged with the discharge decision need only recuse and transfer the file to a person qualified to make the initial decision. We need not hold that the Lloyd-La Follette Act is unconstitutional for its lack of provision for an impartial hearing examiner. Congress is silent on the matter. We would rather assume, because of the constitutional problems in not so providing, that, if faced with the question (at least on the facts of this case) Congress would have so provided. *Volkswagenwerk* v. *FMC*, 390 U. S. 261, 272 (1968). "Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process." *Greene* v. *McElroy*, 360 U. S., at 507 (citations omitted).[13]

---

[13] We further note that appellants suggest that "the Act and regulations, fairly construed, require the determination of cause to be made without bias." Brief for Appellants 24 n. 12.

## B

Appellee also claims a right to a full trial-type hearing at the pretermination stage, particularly asserting that he is denied due process, if not given the opportunity to present and cross-examine witnesses.

While fully realizing the value of a full trial-type hearing as a method for ultimate resolution of the facts, see *id.*, at 496–497, the pretermination hearing is not held for the purpose of making such an ultimate determination. This is provided for through the appeal procedure where the employee is afforded the procedural rights he now seeks at an earlier stage of the proceedings. The function of the pretermination hearing is, and no more is required by due process, to make a probable-cause determination as to whether the charges brought against the employee are or are not true. Where the Court has held that pretermination hearings are required, in past decisions, it has spoken sparingly of the procedures to be required. *Sniadach* was silent on the matter, and *Fuentes* merely required something more than an *ex parte* proceeding before a court clerk. In *Bell*, the Court held that the hearing must involve a probable-cause determination as to the fault of the licensee, and "need not take the form of a full adjudication of the question of liability," realizing that "[a] procedural rule that may satisfy due process in one context may not necessarily satisfy due process in every case." 402 U. S., at 540. Thus, "procedural due process [was to] be satisfied by an inquiry limited to the determination whether there is a reasonable possibility of judgments in the amounts claimed being rendered against the licensee." *Ibid.* We think the clear implication of *Bell* to be that "full adjudication," including presentation of witnesses and cross-examination, need not be provided in every case where a pretermination

hearing of some kind is required by due process or pro-vided by the statute.

In *Goldberg* v. *Kelly,* the Court struck a different note on procedures. Although stating that the only function of the pretermination hearing was "to produce an initial determination of the validity of the welfare department's grounds for discontinuance of payments," and seemingly adopting a probable-cause standard, the Court required cross-examination of witnesses relied upon by the department. The Court was careful to observe, however, that these procedural rules were "tailored to the capacities and circumstances of those who are to be heard." 397 U. S., at 267, 268–269. The decision to cut off AFDC welfare payments leaves the recipient literally without any means to survive or support a family. While this level of deprivation may not be insisted upon as a necessary condition for requiring some kind of pretermination hearing, it may well be decisive in requiring the Government to provide specific procedures at the pretermination stage. The greater the level of deprivation which may flow from a decision, the less one may tolerate the risk of a mistaken decision, cf. *Morrissey* v. *Brewer, supra,* and thus the Court in *Goldberg,* while maintaining that the pretermination hearing was in the nature of a probable-cause determination, was less willing to allow a margin of error as to probable cause. Rules of procedure are often shaped by the risk of making an erroneous determination. See *In re Winship,* 397 U. S. 358, 368 (1970) (Harlan, J., concurring). Indeed, all that was specifically not required in *Goldberg* was a complete record and a comprehensive opinion. 397 U. S., at 267.

In this case, the employee is not totally without prospect for some form of support during the period between the pretermination and final hearing on appeal, though it may not be equivalent in earnings or tenure

, to his prior competitive service position. Although the employee may not be entitled to unemployment compensation, see *Christian* v. *New York Dept. of Labor,* 414 U. S. 614 (1974), since he has been terminated for cause he may get some form of employment in the private sector, and, if necessary, may draw on the welfare system in the interim. Given this basic floor of need, which the system provides, we should not hold that procedural due process is so inflexible as to require the Court to hold that the procedural protections, of a written statement and oral presentation to an impartial hearing examiner provided by regulation, are insufficient. The Court stated in *Richardson* v. *Wright,* 405 U. S. 208 (1972), that new regulations of the Department of Health, Education, and Welfare required that Social Security disability payments were not to be suspended in a pretermination hearing without "notice of a proposed suspension and the reasons therefor, plus an opportunity to submit rebuttal evidence," but could be without an oral presentation, since "[i]n the context of a comprehensive complex administrative program, the administrative process must have a reasonable opportunity to evolve procedures to meet needs as they arise." Cf. *Torres.* v. *New York State Department of Labor,* 333 F. Supp. 341 (SDNY 1971), aff'd, 405 U. S. 949 (1972). Necessarily, to some extent, the Court must share with Congress, in an area where one is called upon to judge the efficacy of particular procedures, a role in defining constitutional requirements, and Congress explicitly left it to the discretion of the agency as to whether such procedures were required. I would not upset that judgment in this case.

In accord with these views, I would affirm the judgment of the three-judge court, ordering reinstatement and backpay, due to the failure to provide an impartial hearing officer at the pretermination hearing. I would.

reverse that part of the court's order enjoining the application of the statute on First Amendment vagueness and overbreadth grounds.

MR. JUSTICE DOUGLAS, dissenting.

The federal bureaucracy controls a vast conglomerate of people who walk more and more submissively to the dictates of their superiors. Our federal employees have lost many important political rights. *CSC* v. *Letter Carriers*, 413 U. S. 548, held that they could be barred from taking "an active part in political management or in political campaigns," a restriction that some of us thought to be unconstitutional, *id.*, at 595 *et seq.* (DOUGLAS, J., dissenting). Today's decision deprives them of other important First Amendment rights.

Heretofore, as my Brother MARSHALL has shown, we have insisted that before a vital stake of the individual in society is destroyed by government he be given a hearing on the merits of the government's claim. Among these personal and vital stakes are welfare benefits, *Goldberg* v. *Kelly*, 397 U. S. 254; the weekly wage of a worker, *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337; a person's driver's license, *Bell* v. *Burson*, 402 U. S. 535; repossession of household goods, *Fuentes* v. *Shevin*, 407 U. S. 67; the position of a tenured professor in a state educational institution, *Board of Regents* v. *Roth*, 408 U. S. 564; revocation of parole, *Morrissey* v. *Brewer*, 408 U. S. 471.

There is more than employment and a job at issue in this case. The stake of the federal employee is not only in a livelihood, but in his right to speak guaranteed by the First Amendment. He is charged with having stated that his superior and the superior's assistant had attempted to bribe a representative of a community action organization with whom the agency (OEO) had

dealings. He is charged with having stated that those men offered a bribe of $100,000 in OEO funds to that organization if its representative would sign a statement against appellee and another OEO employee. This statement in my view was on a subject in the public domain. We all know merely by living in Washington, D. C., the storms that have swept through that agency and its branches. It has dealt with inflammatory problems in the solution of which inflammatory utterances are often made. I realize that it is the tradition of the Court to "balance" the right of free speech against other governmental interests and to sustain the First Amendment right only when the Court deems that in a given situation its importance outweighs competing interests. That was the approach in *Pickering* v. *Board of Education*, 391 U. S. 563, where the Court deemed what a teacher said against the school board was more important than the board's sensibilities. The Court, however, reserved decision where the comments of an employee involved "either discipline by immediate superiors or harmony among coworkers," *id.*, at 570. That is one reason why Mr. Justice Black and I concurred in the result citing, *inter alia,* our opinion in *Time, Inc.* v. *Hill,* 385 U. S. 374. Mr. Justice Black said that the "balancing" or "weighing" doctrine "plainly encourages and actually invites judges to choose for themselves between conflicting values, even where, as in the First Amendment, the Founders made a choice of values, one of which is a free press. Though the Constitution requires that judges swear to obey and enforce it, it is not altogether strange that all judges are not always dead set against constitutional interpretations that expand their powers, and that when power is once claimed by some, others are loath to give it up," *id.*, at 399–400.

The fact that appellee in the present case inveighed

against his superior is irrelevant. The matter on which he spoke was in the public domain. His speaking may well have aroused such animosity in his superior as to disqualify him from being in charge of disciplinary proceedings; [1] and conceivably it could cause disharmony among workers. And these consequences are quite antagonistic to the image which agencies have built. Their dominant characteristic is the application of Peter's Inversion. See L. Peter & R. Hull, The Peter Principle 24–26 (Bantam ed. 1970). In a few words Peter's Inversion marks the incompetent cadre's interest in an employee's *input,* not his *output.*[2]

His *input* reflects his attitude toward the cadre, and toward his work. A pleasant manner, promotion of staff harmony, servility to the cadre, and promptness, civility, and submissiveness are what count. The result is a

---

[1] A judge so reviled is normally not the one to sit in judgment in a criminal contempt proceeding. *Mayberry* v. *Pennsylvania,* 400 U. S. 455. Cf. *Goldberg* v. *Kelly,* 397 U. S. 254, 271.

[2] "The competence of an employee is determined *not by outsiders but by his superior in the hierarchy.* If the superior is still at a level of competence, he may evaluate his subordinates in terms of the performance of useful work—for example, the applying of medical services or information, the production of sausages or table legs or achieving whatever are the stated aims of the hierarchy. That is to say, *he evaluates output.*

"But if the superior has reached his level of incompetence, he will probably rate his subordinates in terms of institutional values; he will see competence as the behavior that supports the rules, rituals and forms of the status quo. Promptness, neatness, courtesy to superiors, internal paperwork, will be highly regarded. In short, such an official *evaluates input* . . .

"In such instances, *internal consistency is valued more highly than efficient service:* this is *Peter's Inversion.* A professional automaton may also be termed a 'Peter's Invert.' He has inverted the means-end relationship." L. Peter & R. Hull, The Peter Principle 25 (Bantam ed. 1970).

great leveling of employees. They hear the beat of only
one drum and march to it. These days employers have
psychological tests by which they can separate the in-
genious, offbeat character who may make trouble from
the more subservient type. It is, of course, none of a
court's problem what the employment policies may be.[3]
But once an employee speaks out on a public issue and
is punished for it, we have a justiciable issue. Appellee
is in my view being penalized by the Federal Government
for exercising his right to speak out. The excuse or
pretense is an Act of Congress and an agency's regu-
lations promulgated under it in the teeth of the First
Amendment: "Congress shall make no law . . . abridging
the freedom of speech, or of the press . . . ." Losing
one's job with the Federal Government because of one's
discussion of an issue in the public domain is certainly
an abridgment of speech.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE
DOUGLAS and MR. JUSTICE BRENNAN concur, dissenting.

I would affirm the judgment of the District Court, both
in its holding that a tenured Government employee must
be afforded an evidentiary hearing prior to a dismissal
for cause and in its decision that 5 U. S. C. § 7501 is
unconstitutionally vague and overbroad as a regulation of
employees' speech.

I

The first issue in this case is a relatively narrow one—
whether a federal employee in the competitive service,
entitled by statute to serve in his job without fear of

---

[3] Apart from discrimination based on race, *Griggs* v. *Duke Power
Co.,* 401 U. S. 424, or on other suspect classifications such as sex.
See *id.,* at 436; 42 U. S. C. § 2000e-2; *Frontiero* v. *Richardson,* 411
U. S. 677, 682 *et seq.*

dismissal except for cause,[1] must be given an evidentiary hearing before he is discharged. We are hardly writing on a clean slate in this area. In just the last five years, the Court has held that such a hearing must be afforded before wages can be garnished, *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969); welfare benefits terminated, *Goldberg* v. *Kelly*, 397 U. S. 254 (1970); a driver's license revoked, *Bell* v. *Burson*, 402 U. S. 535 (1971); consumer goods repossessed, *Fuentes* v. *Shevin*, 407 U. S. 67 (1972); parole revoked, *Morrissey* v. *Brewer*, 408 U. S. 471 (1972); or a tenured college professor fired by a public educational institution, *Board of Regents* v. *Roth*, 408 U. S. 564 (1972); *Perry* v. *Sindermann*, 408 U. S. 593 (1972).

### A

In the *Roth* and *Sindermann* cases, Mr. Justice Stewart established the framework for analysis to determine in what circumstances the Due Process Clause demands a hearing. He observed that although due process is a flexible concept, it is not unlimited in application. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Roth, supra*, at 569. Thus the first issue to be decided is whether appellee had an interest in his tenured Government employment such that his discharge amounts to a deprivation of liberty or property.

The decisions of this Court have given constitutional recognition to the fact that in our complex modern society, wealth and property take many forms.[2] We

---

[1] 5 U. S. C. § 7501 (a).

[2] One noted commentator has observed:

"Changes in the forms of wealth are not remarkable in themselves; the forms are constantly changing and differ in every culture. But today more and more of our wealth takes the form

have said that property interests requiring constitutional protection "extend well beyond actual ownership of real estate, chattels, or money." *Roth, supra,* at 572. They extend as well to "safeguard . . . the security of interests that a person has already acquired in specific benefits." *Id.*, at 576. The test for whether a protected interest has been infringed reflects this broad concept of "property":

> "To have a property interest in a benefit, a person . . . must . . . have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Id.*, at 577.

Accordingly, in *Goldberg* v. *Kelly, supra,* the Court found that public assistance recipients had such a claim of entitlement to welfare benefits grounded in the statute defining eligibility. In *Bell* v. *Burson, supra,* the Court held that a driver's license, once issued, becomes an important property interest because its "continued possession may become essential in the pursuit of a livelihood." 402 U. S., at 539. More to the point, in *Roth* the Court

---

of rights or status rather than of tangible goods. An individual's profession or occupation is a prime example. To many others, a job with a particular employer is the principal form of wealth. A profession or job is frequently far more valuable than a house or bank account, for a new house can be bought, and a new bank account created, once a profession or job is secure." Reich, The New Property, 73 Yale L. J. 733, 738 (1964).

"Society today is built around entitlement [and m]any of the most important of these entitlements now flow from government . . . . Such sources of security . . . are no longer regarded as luxuries or gratuities; to the recipients they are essentials, fully deserved, and in no sense a form of charity." Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L. J. 1245, 1255 (1965).

surveyed the constitutional restraints applicable in the area of public employment:

"[T]he Court has held that a public college professor dismissed from an office held under tenure provisions, *Slochower* v. *Board of Education,* 350 U. S. 551, and college professors and staff members dismissed during the terms of their contracts, *Wieman* v. *Updegraff,* 344 U. S. 183, have interests in continued employment that are safeguarded by due process." 408 U. S., at 576–577.

See also *Connell* v. *Higginbotham,* 403 U. S. 207 (1971). In *Perry* v. *Sindermann, supra,* we found a property interest in the implied tenure policy of a state university.

We have already determined that a legitimate claim of entitlement to continued employment absent "sufficient cause" is a property interest requiring the protections of procedural due process.[3] Thus, there can be little doubt that appellee's tenured Government employment, from which he could not legally be dismissed except for cause, must also be a "property" interest for the purposes of the Fifth Amendment. The job security appellee enjoyed is clearly one of "those claims upon which people rely in their daily lives." *Roth, supra,* at 577. And appellee's interest in continued public employment encompassed more than just the periodic accrual of wages. His dismissal also affects his valuable statutory entitlements to retirement credits and benefits, 5 U. S. C. §§ 8301, 8311–8322, 8331–8348; periodic salary increases, 5 U. S. C. § 5335; and life and health insurance, 5 U. S. C. §§ 8701–8716, 8901–8913 (1970 ed. and Supp II).

We are in agreement that appellee does have a claim of entitlement to his Government job, absent proof of

---

[3] *Board of Regents* v. *Roth,* 408 U. S. 564, 576–578 (1972); *Perry* v. *Sindermann,* 408 U. S. 593, 599–603 (1972).

specified misconduct. MR. JUSTICE REHNQUIST explains, however, that this claim is founded only in statute, and that the statute which guarantees tenure also provides that a hearing is not required before discharge. He concludes that "the property interest which appellee had in his employment was itself conditioned by the procedural limitations which had accompanied the grant of that interest," *ante,* at 155, wryly observing that "a litigant in the position of appellee must take the bitter with the sweet," *ante,* at 154.

Courts once considered procedural due process protections inapplicable to welfare on much the same theory— that "in accepting charity, the appellant has consented to the provisions of the law under which charity is bestowed." [4] Obviously, this Court rejected that reasoning in *Goldberg, supra,* where we held that conditions under which public assistance was afforded, which did not include a pretermination hearing, were violative of due process.[5] In *Sindermann, supra,* the Court held that the Constitution required a hearing before dismissal even where the implicit grant of tenure did not encompass the right to such a hearing. In *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), the Court held that although the limited grant of liberty afforded by parole was conditioned by statute on the possibility of revocation without a prior evidentiary hearing, such a hearing was constitutionally required. In *Bell* v. *Burson, supra,* the

---

[4] *Wilkie* v. *O'Connor,* 261 App. Div. 373, 375, 25 N. Y. S. 2d 617, 620 (1941).

[5] The mechanism for welfare terminations is described in *Goldberg* v. *Kelly,* 397 U. S. 254, 258–260 (1970). In short, the procedure involved prior notice and an opportunity to respond in writing before termination as well as a full trial-type hearing before an independent state official after the termination had been effected. If the recipient prevailed at the later hearing he would be entitled to recover any funds wrongfully withheld.

state statute under which drivers' licenses were issued provided for the suspension of an uninsured motorist's license without a prior hearing. The Court nonetheless held that a hearing was required before the suspension could be effected. In none of these cases did the Court consider a statutory procedure to be an inherent limitation on the statutorily created liberty or property interest.[6] Rather, once such an interest was found, the Court determined whether greater procedural protections were required by the Due Process Clause than were accorded by the statute.

Applying that analysis here requires us to find that although appellee's property interest arose from statute, the deprivation of his claim of entitlement to continued employment would have to meet minimum standards of procedural due process regardless of the discharge procedures provided by the statute. Accordingly, a majority of the Court rejects MR. JUSTICE REHNQUIST's argument that because appellee's entitlement arose from statute, it could be conditioned on a statutory limitation of procedural due process protections, an approach which would render such protection inapplicable to the deprivation of any statutory benefit—any "privilege" extended by Government—where a statute prescribed a termination procedure, no matter how arbitrary or unfair. It would amount to nothing less than a return, albeit in somewhat different verbal garb, to the thoroughly discredited distinction between rights and privileges which once seemed to govern the applicability of procedural due process.[7]

---

[6] Although *Perry* v. *Sindermann, supra,* did not involve a statutorily created interest, it is plainly analogous in that the *dc facto* tenure program on which Sindermann's claim of entitlement was grounded did not explicitly include the right to a hearing.

[7] In a leading case decided many years ago, the Court of Appeals for the District of Columbia Circuit held that procedural due

## B

We have repeatedly observed that due process requires that a hearing be held "at a meaningful time and in a meaningful manner," *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965), but it remains for us to give content to that general principle in this case by balancing the Government's asserted interests against those of the discharged employee. *Goldberg* v. *Kelly,* 397 U. S., at 263; see *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961).

The interests of a public employee in a secure Government job are as weighty as other interests which we have found to require at least the rudimentary protection of an evidentiary hearing as a precondition to termination.

> "This Court has often had occasion to note that the denial of public employment is a serious blow to any citizen. . . . Employment is one of the greatest, if not the greatest, benefits that governments offer in modern-day life." *Roth,* 408 U. S., at 589 (MARSHALL, J., dissenting).

See *Perry* v. *Sindermann, supra; Connell* v. *Higginbotham,* 403 U. S. 207 (1971); *Keyishian* v. *Board of*

---

process protections did not apply to Government employment because it was merely a privilege and not a right. *Bailey* v. *Richardson,* 86 U. S. App. D. C. 248, 182 F. 2d 46 (1950), aff'd by an equally divided Court, 341 U. S. 918 (1951). As we have previously observed, "[t]he basis of this holding has been thoroughly undermined in the ensuing years." *Board of Regents* v. *Roth,* 408 U. S., at 571 n. 9. "[T]he Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' . . . ." *Id.,* at 571. For example, the Court has found constitutional restraints applicable to disqualification for unemployment compensation, *Sherbert* v. *Verner,* 374 U. S. 398 (1963); denial of a tax exemption, *Speiser* v. *Randall,* 357 U. S. 513 (1958); termination of welfare benefits, *Goldberg* v. *Kelly, supra;* and dismissal from public employment, *e. g., Slochower* v. *Board of Higher Education,* 350 U. S. 551 (1956).

*Regents,* 385 U. S. 589 (1967); *Cramp* v. *Board of Public Instruction,* 368 U. S. 278, 288 (1961); *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 185 (1951) (Jackson, J., concurring); *United States* v. *Lovett,* 328 U. S. 303, 316–317 (1946). The Court has recognized the vital importance of employment in related contexts. In *Sniadach* v. *Family Finance Corp.,* the Court expressed its particular concern that "garnishment [of wages] often meant the loss of a job," 395 U. S., at 340, and in *Bell* v. *Burson, supra,* we relied heavily on the fact that a driver's license may be "essential in the pursuit of a livelihood," 402 U. S., at 539. In *Greene* v. *McElroy,* 360 U. S. 474, 508 (1959), the Court construed federal security clearance regulations to avoid the constitutional issues that would be presented if the petitioner were deprived "of his job in a proceeding in which he was not afforded the safeguards of [procedural due process]." See *id.,* at 506–507; *Willner* v. *Committee on Character,* 373 U. S. 96, 103–104 (1963).

An exhaustive study by the United States Administrative Conference of the problem of agency dismissals led the author of the Conference's report to observe:

> "One cannot escape the conclusion, however, that the government employee who is removed from his job loses something of tremendous value that in a market of declining demand for skills may not be replaceable." [8]

And the report also observes:

> "[O]ne must acknowledge what seems to be an accepted, if regrettable, fact of life: Removal from government employment for cause carries a stigma

---

[8] Merrill, Report in Support of Recommendation 72–8, Procedures for Adverse Actions Against Federal Employees, in 2 Recommendations and Reports of the Administrative Conference of the United States 1007, 1015 (1972) (hereinafter Merrill).

> that is probably impossible to outlive. Agency per-
> sonnel officers are generally prepared to concede . . .
> that it is difficult for the fired government worker
> to find employment in the private sector." [9]

Dismissal from public employment for cause may also, therefore, implicate liberty interests in imposing on the discharged employee a stigma of incompetence or wrong-doing that forecloses "his freedom to take advantage of other employment opportunities." *Roth, supra,* at 573; see *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437 (1971).

Given the importance of the interest at stake, the discharged employee should be afforded an opportunity to test the strength of the evidence of his misconduct by confronting and cross-examining adverse witnesses and by presenting witnesses in his own behalf, whenever there are substantial disputes in testimonial evidence. See *Morrissey* v. *Brewer,* 408 U. S., at 487. A dismissal for cause often involves disputed questions of fact raised by accusations of misconduct. Mistakes of identity, distortions caused by the failure of information sources, faulty perceptions or cloudy memories, as well as fabrications born of personal antagonisms are among the factors which may undermine the accuracy of the factual determinations upon which dismissals are based. The possibility of error is not insignificant. Almost a fourth of all appeals from adverse agency actions result in reversal.[10]

In our system of justice, the right of confrontation

---

[9] *Ibid.* The report of the Administrative Conference seems to bear out my Brother DOUGLAS' recent observation:

"Once there is a discharge from a . . . federal agency, dismissal may be a badge that bars the employee from other federal employment. The shadow of that discharge is cast over the area where private employment may be available." *Sampson* v. *Murray,* 415 U. S. 61, 95 (1974) (dissenting).

[10] Merrill 1014 n. 33.

provides the crucible for testing the truth of accusations such as those leveled by appellee's superior and strenuously denied by appellee. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg* v. *Kelly,* 397 U. S., at 269 (citations omitted).[11] The *Goldberg* Court's citation to a well-known passage from *Greene* v. *McElroy,* 360 U. S. 474 (1959), is equally applicable to a dismissal from public employment for cause as to a termination of welfare benefits.

> " 'Certain principles have remained immutable in our jurisprudence. One of these is that where government action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination.' " *Id.,* at 496–497, quoted in *Goldberg* v. *Kelly, supra,* at 270.

See also *Chambers* v. *Mississippi,* 410 U. S. 284, 295–298 (1973); *Pointer* v. *Texas,* 380 U. S. 400 (1965).

---

[11] This case presents no question as to the requirements of due process "where there are no factual issues in dispute or where the application of the rule of law is not intertwined with factual issues." *Goldberg* v. *Kelly,* 397 U. S., at 268 n. 15; see *Mills* v. *Richardson,* 464 F. 2d 995, 1001 (CA2 1972); cf. *FCC* v. *WJR,* 337 U. S. 265, 275–277 (1949); 1 K. Davis, Administrative Law Treatise 412 (1958).

This case and *Goldberg* involve the termination of income, whether in salary or public assistance payments, upon which the recipient may depend for basic sustenance. A person should not be deprived of his livelihood "in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination." *Greene, supra,* at 508; see *Jenkins* v. *McKeithen,* 395 U. S. 411, 423–429 (1969); *Willner* v. *Committee on Character,* 373 U. S., at 103. The stakes are just too high and the possibility of misjudgment too great to allow dismissal without giving the tenured public employee an opportunity to contest its basis and produce evidence in rebuttal. See *Goldberg, supra,* at 266.

It also seems clear that for the hearing to be meaningful, the hearing officer must be independent and unbiased and his decision be entitled to some weight. We addressed the importance of this element of due process in *Goldberg, supra,* where we found the requirements of due process were not met by the review of a welfare termination decision by the caseworker who was, in effect, also the complainant. 397 U. S., at 271. In *Morrissey* v. *Brewer, supra,* we held that an independent decisionmaker must determine whether reasonable grounds exist for parole revocation because an "officer directly involved in making recommendations cannot always have complete objectivity in evaluating them." 408 U. S., at 486. The need for an independent decisionmaker is particularly crucial in the public employment context, where the reason for the challenged dismissal may well be related to some personal antagonism between the employee and his superior, as appears to be the case here.[12] See *Pickering* v. *Board of Education,* 391 U. S. 563, 578–579, Appendix n. 2 (1968).

---

[12] See *ante,* at 137–138. Cf. T. Arnold, Fair Fights and Foul 151 (1965) (describing the potential abuse in a situation where the head

## C.

A discharged federal worker in the competitive service is, in fact, guaranteed a full evidentiary hearing before an impartial decisionmaker whose report is entitled to considerable weight.[13] But the timing of the hearing is discretionary with the employing agency, see 5 CFR § 771.208 (a) (1972), and in many agencies, such as the OEO, the hearing comes long after the employee has been removed from the Government service and payroll. In a sense, then, the real issue is not whether appellee must be accorded an evidentiary hearing, but only whether that hearing should have been afforded *before* his discharge became effective. Although the nature of the hearing required by due process is determined by a balancing process, that hearing must be held at a meaningful time. Accordingly, the Court has embraced a general presumption that one who is constitutionally entitled to a hearing should be heard before the deprivation of his liberty or property takes place. Thus, in *Boddie* v. *Connecticut*, 401 U. S. 371 (1971), the Court observed that the fact that "the hearing . . . is not fixed in form does not affect its root require-

---

of a department is the decisionmaker in a public employee discharge proceeding).

[13] The discharged employee is entitled to a full trial-type proceeding before a single examiner who may not occupy a position directly or indirectly under the jurisdiction of the official who proposed the dismissal or who bears ultimate responsibility for that decision. The examiner's decision is afforded substantial weight; if it is rejected, the rejection must be accompanied by a full statement of reasons that is subject to review. Both the employee and the agency may produce, examine, and cross-examine witnesses under oath or affirmation, and documentary evidence may also be introduced. Rigorous trial formality is avoided and care taken not to place an uncounseled employee at a disadvantage. See Merrill 1038–1040; 5 CFR §§ 771.209–771.211 (1972).

ment that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Id.,* at 378–379. (Emphasis in orginal.) In *Bell* v. *Burson, supra,* we held that "except in emergency situations . . . due process requires that when a State seeks to terminate an [important property] interest . . . it must afford 'notice and opportunity for hearing . . .' *before* the termination becomes effective." 402 U. S., at 542 (emphasis in original) (footnote omitted). In *Goldberg* v. *Kelly, supra,* the Court found that an evidentiary hearing held after the termination of welfare benefits was inadequate to satisfy constitutional requirements.[14]

Even if we accept appellants' assertion that a subsequent hearing affords the discharged employee an opportunity to clear his name,[15] the worker still has a significant interest in retaining his job pending a full hearing.[16] Almost a fourth of all appeals from agency

---

[14] The procedure in *Goldberg* also involved a pretermination right of reply and a full trial-type hearing after termination, see n. 5, *supra,* but the scheme was nonetheless found not to satisfy due process requirements and a full pretermination hearing was required. See O'Neil, Of Justice Delayed and Justice Denied; The Welfare Prior Hearing Cases, 1970 Sup. Ct. Rev. 161, 169.

[15] See n. 9, *supra,* and n. 19, *infra.*

[16] Both MR. JUSTICE REHNQUIST and MR. JUSTICE WHITE dismiss the need for a full prior hearing partially by reference to the Court's decision in *Cafeteria Workers* v. *McElroy,* 367 U. S. 886. (1961). That case is entirely inapposite. First, it involved not the dismissal for cause of a tenured civil service employee, but rather the withdrawal of the security clearance of the employee of a private contractor, which, in effect, barred the worker from her job in the commissary at a military base. The employer was prepared to employ the worker at another of his restaurants, so the withdrawal of her security clearance was not

dismissals result in a finding that the termination was illegal.[17] And, the delay from discharge to ultimate vindication at a hearing on appeal is far from insubstantial. More than 75% of adverse personnel actions take more than two months to process; over half take more than three months and a not insignificant number take more than a year.[18] The longer the period between the discharge and the hearing, the more devastating will be the impact of the loss of employment.

During the period of delay, the employee is off the Government payroll. His ability to secure other employment to tide himself over may be significantly hindered by the outstanding charges against him.[19] Even aside from the stigma that attends a dismissal for cause, few employers will be willing to hire and train a new employee knowing that he will return to a former Government position as soon as an appeal is successful.[20]

---

apt to cause the serious financial hardship that appellee's dismissal from public employment might entail. See *Board of Regents v. Roth*, 408 U. S., at 584–585 (DOUGLAS, J., dissenting). Moreover, the Court has since read *Cafeteria Workers* to be a case where the Government's "exceptional" interest in national security justified an abridgment of the right to a hearing. *Fuentes* v. *Shevin*, 407 U. S. 67, 91 n. 23 (1972); see *Boddie* v. *Connecticut*, 401 U. S. 371, 379 (1971).

[17] Merrill 1014 n. 33.

[18] *Id.*, at 1016.

[19] My Brother REHNQUIST argues that the stigma imposed by dismissal is only temporary in that the discharged employee can clear his name at the *post-hoc* hearing, hence does not "foreclose his freedom to take advantage of other employment opportunities." *Board of Regents* v. *Roth*, 408 U. S., at 573; see n. 9, *supra*. But the stigma of outstanding charges would nonetheless be borne by the employee in the interim period while he waits for his hearing and seeks alternative employment to tide himself over.

[20] See, *e. g.*, Hearings on Postal Labor Relations and Employee Morale before the Subcommittee on Postal Operations of the House

And in many States, including Illinois, where appellee resides, a worker discharged for cause is not even eligible for unemployment compensation.[21]

Many workers, particularly those at the bottom of the pay scale, will suffer severe and painful economic dislocations from even a temporary loss of wages. Few public employees earn more than enough to pay their expenses from month to month. See Sampson v. Murray, 415 U. S. 61, 97 (1974) (MARSHALL, J., dissenting). Like many of us, they may be required to meet substantial fixed costs on a regular basis and lack substantial savings to meet those expenses while not receiving a salary. The loss of income for even a few weeks may well impair their ability to provide the essentials of life—to buy food, meet mortgage or rent payments, or procure medical services. Ricucci v. United States, 192 Ct. Cl. 1, 9–11, 425 F. 2d 1252, 1256–1257 (1970) (Skelton, J., concurring). The plight of a discharged employee may not be far different from that of the welfare recipient in Goldberg who, "pending resolution of a controversy . . . . may [be] deprive[d] . . . of the very means by which to live while he waits." 397 U. S., at 264. Appellee, although earning an annual salary of $16,000 before his dismissal, far above the mean salary for federal employees,[22] was nonetheless driven to the brink of financial ruin while he waited. He had to borrow money to support his family, his debts went unpaid, his family lost the protection of his health insurance and, finally, he was forced to apply for public

Committee on Post Office and Civil Service, 91st Cong., 1st Sess. (1969); Kennedy, Adverse Actions in the Agencies—Words and Deeds—Postal Adverse Action Procedures, 19 Am. U. L. Rev. 398, 412 (1970).

[21] See, e. g., Ill. Rev. Stat., c. 48, § 432 (1973); see Christian v. New York Dept. of Labor, 414 U. S. 614 (1974).

[22] See Mandate for Merit: 1972 Annual Report of the United States Civil Service Commission 64–65.

assistance.   App. 128 *et seq.*   In this context justice de-
laye*d* may well be justice denied.

To argue that a dismissal from tenured Government
employment is not a serious enough deprivation to
require a prior hearing because the discharged employee
may draw on the welfare system in the interim, is to
exhibit a gross insensitivity to the plight of these
employees.   First, it assumes that the discharged
employee will be eligible for welfare.   Often welfare
applicants must be all but stripped of their worldly goods
before being admitted to the welfare roles, hence it is
likely that the employee will suffer considerable hard-
ship before becoming eligible.   He may be required not
only to exhaust his savings but also to convert many
of his assets into cash for support before being able to
fall back on public assistance.   He may have to give up
his home or cherished personal possessions in order to
become eligible.   The argument also assumes all but
instant eligibility which is, sadly, far from likely even
when all the employee's other sources of support have
been depleted.   Moreover, rightly or wrongly, many
people consider welfare degrading and would decline
public assistance even when eligible.   Finally, the level
of subsistence provided by welfare is minimal, certainly
less than one is apt to expect from steady employment.
The substitution of a meager welfare grant for a regular
paycheck may bring with it painful and irremediable
personal as well as financial dislocations.   A child's
education may be interrupted, a family's home lost, a
person's relationship with his friends and even his family
may be irrevocably affected.   The costs of being forced,
even temporarily, onto the welfare rolls because of a
wrongful discharge from tenured Government employ-
ment cannot be so easily discounted.

Nor does the availability of backpay upon an ultimate

finding that the dismissal was improper alleviate the compelling nature of the employee's plight. Cf. *Sampson* v. *Murray,* 415 U. S., at 97 (MARSHALL, J., dissenting). In *Sniadach* v. *Family Finance Corp., supra,* the Court recognized that the employee had an interest in the enjoyment of his wages as they accrued and noted that even a temporary loss of salary could put a wage earner below the poverty level or "drive a wage-earning family to the wall." 395 U. S., at 341–342. Thus, we held that a wage earner is entitled to a hearing prior to the garnishment of his wages even though he would ultimately get his frozen earnings back when and if he prevailed in a suit on the merits. See also, *id.,* at 343 (Harlan, J., concurring). And, in *Fuentes* v. *Shevin,* 407 U. S. 67 (1972), the Court held that due process required a hearing before a seizure of property by writ of replevin, observing:

> "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process had already occurred. 'This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone.'" *Id.,* at 81–82.

The *Fuentes* Court, applying these considerations, albeit in dicta, observed that, "[i]n cases involving deprivations of other interests, such as government employment, the Court similarly has required an unusually important governmental need to outweigh the right to a prior hearing." *Id.,* at 91 n. 23.

The Court has recognized a number of instances where a vital governmental interest may outweigh the right to a prior hearing, including the need to seize property to "collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated foods." *Id.,* at 92 (footnotes omitted).[23] Such a vital interest is clearly lacking here.

The Government's asserted interests in not affording a predismissal hearing are twofold. First, appellants argue that the delay in holding the hearing makes the functioning of the agency more efficient. We rejected a similar rationale in *Goldberg,* 397 U. S., at 266, and observed in *Fuentes, supra:*

"A prior hearing always imposes some costs in time, effort, and expense, and it is often more efficient to dispense with the opportunity for such a hearing. But these rather ordinary costs cannot outweigh the constitutional right. Procedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions [or property] are about to be taken.

"'. . . [T]he Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre

_____

[23] See, *e. g., Central Union Trust Co.* v. *Garvan,* 254 U. S. 554, 566 (1921); *Phillips* v. *Commissioner,* 283 U. S. 589, 597 (1931); *Ewing* v. *Mytinger & Casselberry,* 339 U. S. 594 (1950).

ones.' " 407 U. S., at 90–91, n. 22 (citations omitted).

Moreover, the Government's interest in efficiency in this case is entirely unconvincing. The applicable statute does not prohibit prior hearings but rather makes them discretionary with the agency. Nine federal agencies, including the FCC, NLRB, HUD, HEW, the Department of Justice, and the Civil Service Commission itself, regularly accord evidentiary hearings prior to the dismissal of a tenured employee.[24] The Administrative Conference of the United States, on the basis of its exhaustive study of federal agency proceedings for the dismissal of employees in the competitive service, strongly recommended that evidentiary hearings be held prior to discharge.[25]

The Administrative Conference found that the evidence, although inconclusive, indicates that the agencies that provided pretermination hearings closed adverse action proceedings more quickly than those which did not hold an evidentiary hearing until after the dismissal had been effected. It also found that the delays in closing cases involving hearings are typically caused not by the length of the hearings—almost all are completed within a day—but rather by scheduling difficulties. And those agencies which take three months or more to hold post-termination hearings have little incentive to decide dismissal cases more promptly, since the employee has already been discharged and he bears most of the costs of delay. If the hearing were required before termination, agencies would have a far greater incentive to decide

---

[24] Merrill 1056.

[25] Recommendation 72–8, Adverse Actions Against Federal Employees, in 2 Recommendations and Reports of the Administrative Conference of the United States 73–75 (1972).

these cases expeditiously.[26] Finally, providing an evidentiary hearing before the discharge might well obviate the practical and constitutional need for a full post-termination proceeding.[27]

The Government also argues that if a supervisor were unable to effect an immediate removal of a troublesome employee from his agency, the discipline and efficiency of the whole office might be disrupted. Under the prevailing practice, an agency may not dismiss an employee until 30 days after he has received notice of the charges against him and has had an opportunity to reply. Thus, fellow workers and supervisors must now function with the threatened employee in their midst for at least a month, and there seems little reason why a hearing could not be held during that 30-day period.[28] If the employee actually threatens to disrupt the operation of the office, he could be put on administrative leave or temporarily assigned to a less sensitive position pending his hearing, as currently provided for by regulation. 5 CFR § 752.202 (d).

---

[26] Merrill 1017, 1056–1057, 1060. Scheduling problems might be largely overcome by more skillful use of personnel. See *Goldberg* v. *Kelly*, 397 U. S., at 266.

[27] As we observed, *id.*, at 267 n. 14, due process does not, of course, require two hearings. Under current procedures, an employee is afforded one and sometimes two *post-hoc* evidentiary hearings (one before the agency and the other before the Civil Service Commission). See Merrill 1013, 1043. If an adequate review mechanism is maintained, a single pretermination hearing might obviate the need for these later proceedings.

[28] See, *e. g.*, U. S. Dept. of Justice, Adverse Action Hearings, Appeals and Grievance Policies and Regulations, c. 2 (Sept. 28, 1972); Recommendation 72–8, n. 25, *supra*, at ¶ B, 74. The notice requirement need not be any impediment to holding the hearing within the 30-day period. In *Goldberg* v. *Kelly*, *supra*, at 268, for example, the Court found a seven-day period between notice and termination hearing constitutionally permissible.

The only pretermination proceeding accorded appellee was a "right of reply," see 5 CFR § 752.202 (b), but the "right of reply" falls far short of being the meaningful hearing which, in my view, is constitutionally required. As the author of the Administrative Conference Report observed:

> "In most agencies . . . an employee's right to reply simply means that he may meet informally with a representative of the agency and advance oral representations that he hopes will sway the final decision. He has no right at this stage to present witnesses or to confront and cross-examine the agency's witnesses." [29]   (Footnotes omitted.)

The agency official before whom the employee appears need not be the decisionmaker; he need only be able to recommend a decision. Moreover, the hearing examiner or the person responsible for the decision to discharge the employee may well be the complainant or his direct subordinate. In the case before us, for example, the decision as to whether appellee should be discharged was made by the OEO Regional Director whom appellee had accused of misconduct. The Regional Director assembled the evidence against appellee, proposed the dismissal, then decided it should be effected; he acted as complaining witness, prosecutor, and judge. The meaningless bureaucratic paper shuffling afforded appellee before his discharge would surely not alone satisfy the stringent demands of due process when such an important interest is at stake.

The decisions of this Court compel the conclusion that a worker with a claim of entitlement to public employment absent specified cause has a property interest protected by the Due Process Clause and there-

---

[29] Merrill 1033.

fore the right to an evidentiary hearing before an impartial decisionmaker prior to dismissal. Accordingly, I would affirm the decision of the court below that appellee had been discharged in violation of his procedural due process rights.

## II

The court below also held that the provision of the Lloyd-La Follette Act which authorizes dismissal of tenured Government employees for "such cause as will promote the efficiency of the service" is unconstitutionally vague and overbroad.[30]

There is no dispute that the phrase " 'such cause as will promote the efficiency of the service' as a standard of employee job protection is without doubt intended to authorize dismissal for speech," *ante,* at 160. The majority finds this permissible because in *Pickering* v. *Board of Education,* 391 U. S. 563, 568 (1968), we observed that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with the regulation of the speech of the citizenry in general." But, the majority seems to have ignored the passage in *Pickering* that directly precedes the quoted material:

> "[T]o suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights.

---

[30] Other cases in this area hardly provide substantial guidance as to what speech is or is not protected. See, *e. g., Pickering* v. *Board of Education,* 391 U. S. 563, 570 n. 3 (1968). Nor do the extant regulations provide substantial guidance; they merely repeat the language of the statute and provide examples as unelucidating as the particular regulation relevant to this case which proscribed "any action . . . which might result in, or create the appearance of . . . (c) [i]mpeding Government efficiency or economy ... [or] (f) [a]ffecting adversely the confidence of the public in the integrity of the Government." 5 CFR § 735.201a; see 45 CFR § 1015.735-1.

228

they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, . . . proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. *E. g., Wieman* v. *Updegraff,* 344 U. S. 183 (1952); *Shelton* v. *Tucker,* 364 U. S. 479 (1960); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967)." 391 U. S., at 568.

The importance of Government employees' being assured of their right to freely comment on the conduct of Government, to inform the public of abuses of power and of the misconduct of their superiors, must be self-evident in these times. In *Pickering,* this Court specifically upheld the right of a public employee to criticize the conduct of his superiors. *Id.,* at 573–574. In fact, it appears that one of the primary purposes of the Lloyd-La Follette Act was to protect such criticism from official retribution. Senator La Follette gave the following example of an abuse sought to be cured by the bill:

"The cause for [the employee's] dismissal was that he gave publicity to the insanitary conditions existing in some part of the post-office building in Chicago where the clerks were required to perform their services. . . . [H]e furnished some facts to the press of Chicago, and the publication was made of the conditions. They were simply horrible . . . . The public health officers of Chicago, as soon as their attention was called to the conditions, condemned the situation as they found it; and yet this young man, one of the brightest fellows I have met, was removed from the service because he had given publicity to these outrageous conditions." 48 Cong. Rec. 10731 (1912).

The "efficiency of the service" standard would appear to bring within its reach, as permissible grounds for dismissal, even truthful criticism of an agency that in any way tends to disrupt its operation. One can be sure, for example, that the young man's criticism in Senator La Follette's example disrupted the operation of the Chicago Post Office. It seems clear that the standard could be construed to punish such protected speech.

The majority purports to solve this potential overbreadth problem merely by announcing that the standard in the Act "excludes protected speech." Nonetheless, it leaves the statutory standard intact and offers no guidance other than general observation as to what conduct is or is not punishable.[31] The Court's answer is no answer at all. To accept this response is functionally to eliminate overbreadth from the First Amendment lexicon. No statute can reach and punish constitutionally protected speech. The majority has not given the statute a limiting construction but merely repeated the obvious.

The majority misunderstands the overbreadth principle which concerns the potential deterrent effect on constitutionally protected speech of a statute that is overbroad or vague on its face    The focus of the doctrine is not on the individual actor before the court but on others who may forgo protected activity rather than run afoul of the statute's proscriptions. Hence, the Court has reversed convictions where the subject speech could have been punished under a more narrowly drawn statute because the statute as drawn purported to cover, and

---

[31] The Administrative Conference Report reserved particularly harsh criticism for the "efficiency of the service" standard, terming it "deficient both as a guide to agency management and as a warning to employees of the sorts of behavior that will get them in trouble," warning that it is "an invitation to arbitrary action by government agencies." Merrill 1054; see id., at 1053.

might deter others from engaging in, protected speech. The Court explained this vagueness-overbreadth relationship in *Keyishian* v. *Board of Regents,* 385 U. S., at 603–604:

"We emphasize once again that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms,' *N. A. A. C. P.* v. *Button,* 371 U. S. 415, 438; '[f]or standards of permissible statutory vagueness are strict in the area of free expression. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.' *Id.,* at 432–433. . . . When one must guess what conduct or utterances may lose him his position, one necessarily will 'steer far wider of the unlawful zone . . . .' *Speiser* v. *Randall,* 357 U. S. 513, 526. For '[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions.' *N. A. A. C. P.* v. *Button, supra,* at 433. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform [public employees] what is being proscribed."

By the uncertainty of its scope, the standard here creates the very danger of a chilling effect that concerned the Court in *Keyishian.*[32] Employees are likely to limit

---

[32] Further refinement of the statutory "efficiency of the service" standard, is not, as the majority implies, impossible. The Administrative Conference points out that the agencies and the Civil Service Commission "have developed a large, still essentially secret body of law on the meaning of 'efficiency.'" Merrill 1054. Reference to this body of precedent might well serve as a basis for the amplification of the statutory standard. Relevant guidelines might, for example, distinguish between statements made in an official as opposed to a private capacity, see *Pickering* v. *Board of Education,* 391 U. S. 563 (1968); between knowingly false statements and those

their behavior to that which is unquestionably safe, for "the threat of dismissal from public employment is . . . a potent means of inhibiting speech." *Pickering*, 391 U S., at 574. The dismissal standard hangs over their heads like a sword of Damocles, threatening them with dismissal for any speech that might impair the "efficiency of the service." That this Court will ultimately vindicate an employee if his speech is constitutionally protected is of little consequence—for the value of a sword of Damocles is that it hangs—not that it drops. For every employee who risks his job by testing the limits of the statute, many more will choose the cautious path and not speak at all.

The District Court found that "[b]ecause employees faced with the standard of 'such cause as will promote the efficiency of the service' can only guess as to what utterances may cost them their jobs, there can be little question that they will be deterred from exercising their First Amendment rights to the fullest extent." I agree with that characterization of the effect of the standard and would, therefore, uphold the conclusion of the District Court that the statute is unconstitutionally vague and overbroad.

I respectfully dissent.

---

which are reasonably believed to be true, see, *e. g.*, *Pickering, supra,* at 569; *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 280 (1964); cf. *Garrison* v. *Louisiana,* 379 U. S. 64 (1964); *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971); and between statements which pertain to a legitimate subject of public comment and those which disclose confidential Government information, see *Pickering, supra,* at 570 n. 3 and 571–572; cf. *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967).